**FIRST CAPITAL LIFE INSURANCE COMPANY—IN CONSERVATION, Plaintiff,**

v.

**AAA COMMUNICATIONS, INC. and Patricia Ann Tate, Defendants.**

Civ. No. 1:92–cv–1867–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 27, 1995.

Anthony James McGinley, Carter & Ansley, Atlanta, GA, Anne Louise Tanner, Webb, Tanner & Powell, Lawrenceville, GA, for Plaintiff.

William Watson Lavigno, III, Lavigno & Schlueter, Conyers, GA, Robert Altman, Office of Robert Altman, Atlanta, GA, for Defendants.

### ORDER

CARNES, District Judge.

The above-styled case was tried before the Court on April 18, 1995. Plaintiff First Capital life Insurance Company (hereinafter "First Capital"), filed this interpleader action seeking to have the Court determine the proper beneficiary of $150,000.00 in proceeds under a life insurance policy (hereinafter "the Policy"). Defendant AAA Communications, Inc. (hereinafter "AAA"), purchased the Policy through First Capital on the life of Billy Joel Tate, who died on October 4, 1991. AAA permitted Mr. Tate, during his employment, to designate a beneficiary under the Policy.

Defendant Patricia Ann Tate (hereinafter "Tate") claims ownership of the proceeds on the theory that when AAA purchased the Policy, the rights to ownership immediately vested in her husband, Billy Tate, who named her the beneficiary of the Policy. She claims that the Employee Retirement Income Security Act (hereinafter "ERISA") governs this case, and AAA's act of attempting to change the beneficiary to itself violated the federal statute. AAA claims ownership of the proceeds alleging that it permissibly exercised its rights as the owner of the Policy, effectively changing the beneficiary to itself before Mr. Tate's death.

### I. Parties' Claims to Insurance Proceeds

#### A. Findings of Fact

1. Mr. Tate was an employee of Georgia Construction Company from approximately May 1, 1983 through December 1, 1989.

2. Georgia Construction Company was a proprietorship and business related to defendant AAA in that both were owned by Clarence and Marie Hall.

3. The Halls also owned AAA Paging, a business which they sold in 1987. The proceeds from that sale were channeled into AAA, which was formed in 1988. The Halls wished to use some of the proceeds for investment purposes and contemplated purchasing investment grade insurance for themselves and their two full-time employees, Kathy Ortman and Billy Tate.

4. AAA's President, Clarence Hall, and Secretary/Treasurer, Marie Hall, met with Ted Propes, an insurance specialist and non-qualified plan specialist at Robinson–Humphrey Company, Inc.[1] to discuss options for creating some type of benefit plan to institute at AAA.

5. The Halls wanted a relatively simple plan with few administrative obligations. Specifically, they did not want to create a plan that would be subject to ERISA regulation.

6. Accordingly, Propes suggested that AAA buy individual universal life insurance policies for each of the participants in the plan. He further represented that this arrangement would not fall within the ambit of ERISA regulation.

7. AAA took his advice and decided to fund their plan by purchasing life insurance policies from First Capital for Clarence Hall, Marie Hall, and AAA's two full-time employees, Billy Tate and Kathy Ortman.

8. On December 19, 1988, AAA's Board of Directors passed a Consent Resolution (hereinafter "the Resolution")[2] in favor of establishing a "Non–Qualified Executive Retirement Plan" (hereinafter "the Plan").[3]

9. The policies AAA purchased had two components: a life insurance component and a savings component. As to the savings component, the policies would not accumulate any substantial cash value, however, unless held for a number of years.

10. Propes met with Hall and Mr. Tate on December 23, 1988. Hall described the Plan to Mr. Tate, including the vesting requirements set forth in the Resolution. Hall explained that AAA was the owner of the Policy and Mr. Tate understood that, pursuant to the Resolution, he must remain employed for five more years in order to become the owner of the Policy.

11. On the same day, AAA gave Propes the completed insurance application and a premium payment of $5000.00 for Mr. Tate's policy, along with the applications and premium payments for the other three policies.

12. Propes mailed the application and premium payment to First Capital. This payment was the only one made by AAA for the Policy.

13. On March 13, 1989, First Capital issued the life insurance policies. AAA was listed as the owner of each of the policies.

14. Neither the Resolution nor the Policy required fixed premium payments. (See Policy at 5.) The owner could choose the amount and frequency of payments. In or-

---

1. Robinson–Humphrey was owned by Shearson Lehman Brothers during the relevant time period.

2. The Resolution provides as follows:
   1. To obtain a Non–Qualified Executive Retirement Plan for the President (Clarence Hall), Secretary–Treasurer (Marie Hall), tower maintenance (Billy Tate), bookkeeper (Kathy Ortman) and other key personnel; to offer this plan as an incentive for officers and key personnel to stay with the Corporation.
   2. To obtain this plan through Shearson Lehman Brothers.
   3. The purpose will be tax breaks for the Corporation and retirement benefits to employees.

4. The Officers and participating personnel (qualified) shall have a vested interest in the Program only after a period of five years of continuous service with Corporation. If the employees remains (sic) with the Corporation for five years, the plan will become theirs. If the participating employee shall leave for any reason, or is laid off or terminated, the plan will remain the property of the corporation.

3. A Plan that is non-qualified means that it does not meet the Internal Revenue Code's requirements for favorable tax treatment. *See* 26 U.S.C. §§ 401–419A.

der to maintain the Policy, however, premium payments of approximately $157.00 were due monthly. Accordingly, each month, $157.00 was deducted from AAA's initial $5000.00 contribution. The money in excess of the premium was kept in an "accumulation account" that accrued interest at the rate of roughly four percent per year. (Policy at 4.) In the event that AAA made no further contributions and the funds in the accumulation account were inadequate to pay the premium then due, the Policy would lapse.

15. Page three (3) of the Policy, entitled "Specifications" states that AAA arranged a schedule to pay $5000.00 annually into the Policy. AAA never made any payments other than the initial $5000.00 payment.

16. AAA permitted Mr. Tate to designate a beneficiary under the Policy, and he named defendant Patricia Ann Tate, his wife, as the recipient of the proceeds in the event of his death.

17. Mr. Tate was laid off from AAA on December 1, 1989.

18. After Mr. Tate's employment ended, Hall contacted Propes to determine what should be done with the Policy. (Transcript at 120, 182.)

19. One alternative was to offer Mr. Tate the option to purchase the Policy from AAA. Mr. Tate declined this offer.

20. The alternative chosen was to change the designated beneficiary on the Policy to AAA in order to preserve the initial $5000.00 investment. (Transcript at 183.)

21. On January 25, 1990, AAA filled out a change of beneficiary designation form (hereinafter "Designation Form") in Propes' office, thus replacing defendant Tate as the beneficiary.

22. Propes and Philip Catledge, another employee at Robinson–Humphrey, witnessed Hall's signature. (Transcript at 98.)

23. The Designation Form stated that the new designation would become effective only when signed by the First Capital registrar.

24. Propes, as the insurance agent, was responsible for forwarding the completed form to First Capital.

25. Mr. Tate died on October 4, 1991.

26. The Designation Form that AAA had executed on January 25, 1990 remained in Propes' office and was not recorded as received and signed by the registrar at First Capital until October 25, 1991, twenty-one (21) days after Mr. Tate's death.

27. On December 16, 1991, AAA filed a claim for the life insurance benefits on the life of Mr. Tate.

28. First Capital informed the Halls that before any proceeds would be distributed to them, a waiver of interest form must be received from Mrs. Tate.

29. Mrs. Hall wrote Mrs. Tate requesting that she sign a waiver form. Mrs. Tate did not sign the form.

30. The present interpleader action was initiated by First Capital.

### B. Conclusions of Law

#### 1. Background

Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the value of the matter in controversy exceeds fifty thousand dollars ($50,000), exclusive of interest and costs.[4]

AAA claims that it is entitled to the proceeds of the life insurance policy on Mr. Tate's life because it paid for the policy, it was the owner of the policy, and it had the right to change the beneficiary, which it did, naming itself as the beneficiary prior to Mr. Tate's death. Acknowledging that the designation form that changed the beneficiary from Mrs. Tate to AAA was not recorded prior to Mr. Tate's death, AAA argues that it should prevail because it had substantially complied with designation requirements— that is, it had done its part by executing properly the designation form and, through no fault of AAA's, the designation form was not recorded at the time of execution.

4. Alternatively, this Court has jurisdiction under 29 U.S.C. § 1132(e) if the case is governed by the Employee Retirement Income Security Act.

Conversely, Tate contends that the Resolution, in combination with the insurance policies purchased by AAA, comprised an employee welfare benefit plan [5] and an employee pension benefit plan,[6] thus bringing this dispute within the purview of ERISA and preempting state laws "insofar as they ... relate to any employee benefit plan." [7] 29 U.S.C. § 1144. State law governing the change of a life insurance beneficiary "relates to" an employee benefit plan and is preempted by ERISA.[8] *Phoenix Mutual Life Ins. Co. v. Adams*, 30 F.3d 554 (4th Cir.1994); *Brown v. Connecticut General Life Ins. Co.*, 934 F.2d 1193, 1196 (11th Cir.1991). Tate contends that if ERISA controls, she should prevail.

The issue of whether the Plan constituted an employee *welfare* benefit plan has been addressed by an order of this Court dated September 12, 1994. In that order, Judge Robert H. Hall granted partial summary judgment to defendant Tate, finding that AAA's Retirement Plan is an employee welfare benefit plan governed by ERISA. This Court need not revisit Judge Hall's determination, as it concludes that the result is the same under state or federal law. The Court will first analyze the issues under state law. Next, for purposes of examining Tate's arguments, the Court will assume, without deciding, that the Plan is either an employee welfare benefit plan or an employee pension benefit plan.

**2. *Analysis of Parties' Entitlement to Proceeds under State Law***

The Court first addresses the issue of ownership of the Policy. If Mr. Tate owned the Policy at his death, Mrs. Tate is entitled to the proceeds, as AAA would have been powerless to change the beneficiary designation. If AAA retained ownership of the Policy, further examination of state insurance law would be required to determine whether its attempted change of beneficiary was effective.

AAA purchased a life insurance policy on its employee, Billy Tate, effective March 13, 1989. It made a one-time payment of $5,000, from which the insurance company deducted monthly premiums of $157.[9] In purchasing this policy, the corporate resolution stated that the participating personnel (Billy Tate) would have a vested interest in the program

> only after a period of five years of continuous service with Corporation. If the employees remains (sic) with the Corporation for five years, the plan will become theirs. If the participating employee shall leave for any reason, or is laid off or terminated, the plan will remain the property of the corporation.

AAA argues that this language means that the employee, Billy Tate, had a vested interest only if he remained employed with AAA for a period of five years after the effective date of the insurance policy. After five years

---

**5.** An "employee welfare benefit plan" is defined by the 29 U.S.C. section 1002(1) as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) ... benefits in the event of sickness, accident, disability, death or unemployment....

**6.** An "employee pension benefit plan" is defined by 29 U.S.C. section 1002(2)(A) as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
> (i) provides retirement income to employees, or

> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond ...

**7.** Both employee welfare benefit plans and employee pension benefits plans fall within the statutory definition of an "employee benefit plan." 29 U.S.C. § 1003.

**8.** ERISA provides a savings clause whereby state laws regulating insurance are not preempted. 29 U.S.C. § 1144(b)(2)(A). Application of the substantial compliance doctrine does not implicate the regulation of insurance and fails to satisfy the savings clause criteria. *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 561 (4th Cir. 1994).

**9.** This $5000 initial contribution accumulated interest approximating 4% annually on the amount of the contribution remaining after the monthly premiums were paid.

of such continuous service, Mr. Tate would have become the owner of the policy. Because Mr. Tate did not remain with AAA for five more years, but instead was terminated less than a year after the policy went into effect, AAA argues that it retained ownership of the policy.

Mrs. Tate contends, however, that the above language of the resolution meant that if Mr. Tate already had five years of continuous service with the Company, which he did at the time of the purchase of the policy, then the policy was immediately his at its effective date and, accordingly, only he could designate or change the beneficiary.

■ The Court concludes that the language of the Resolution governing the vesting requirement—"five years of continuous service" and "remains for five years"—is capable of more than one reasonable interpretation and is ambiguous, as Judge Hall likewise found in his order of September 12, 1994. In order to resolve the ambiguity, the intent of the parties must be determined. *Richard Haney Ford, Inc. v. Ford Dealer Computer Services*, 218 Ga.App. 315, 316, 461 S.E.2d 282 (applying Georgia rules of construction under O.C.G.A. § 13-2-2). Further, parol or extrinsic evidence is admissible to resolve the ambiguity in a contract. *Karlan, Inc. v. King*, 202 Ga.App. 713, 715, 415 S.E.2d 319 (1992) (examining parol evidence to clarify the intent of parties to a Termination Agreement).

■ The Court concludes that the following evidence demonstrates that AAA's intent was to confer ownership of the Policy on Mr. Tate after five *additional* years of service measured from the effective date of the Plan [10]:

a. The Resolution stated that AAA wished to provide incentive for its employees to stay with the corporation. If Mr. Tate were vested immediately, that clause in the Resolution would be meaningless.

b. AAA was listed as the owner of the Policy from the time of purchase and retained physical control over the document.

c. Mr. Tate never asserted ownership of the Policy, even after he left AAA's employ. At that time, Propes had explained to Mr. Tate that he would have to pay for the policy and the latter did not raise any objections or claim a preexisting ownership in the policy. Indeed, after Mr. Tate was laid off, AAA offered him the opportunity to *purchase* the policy and he declined.

■ In addition, a contract should be construed "by examining the agreement in its entirety, and not merely by examining isolated clauses and provisions thereof." *Richard Haney*, 218 Ga.App. at 316, 461 S.E.2d 282. In addition to requiring five years of service, the Resolution also provided that if the employee should be laid off or terminated, the Policy would remain with AAA. This sentence only makes sense, in conjunction with the vesting requirement language, if AAA intended to count only prospective service with the company. If Mr. Tate had an immediately vested right to the Policy, then the language permitting forfeiture is rendered meaningless.

■ Finally, "[g]reater regard [should be afforded] to the clear intent of the parties than to any particular words which they may have used in the expression of their intent." *Carter v. Marble Products, Inc.*, 171 Ga. 49, 55, 154 S.E. 891 (1930). Interpreting the Resolution to require that Mr. Tate remain employed with AAA for five more years, rather that five years total, gives effect to all of the clauses and is consistent with the discernible intent of AAA when drafting it.

■ Accordingly, the Court concludes that because Mr. Tate's interest had not vested under the terms of the resolution, AAA remained the owner of the policy up to the time of Mr. Tate's death. As the rightful owner of the Policy, AAA had the power to

---

10. Under ERISA, a plan is effective when it is both written and adopted. Employee Retirement Income Security Act of 1974 § 1017(a); 26 C.F.R. § 1.411(a)-2. In this case, the Plan was written and adopted on December 19, 1988, the date the AAA Board of Directors passed the Resolution.

change the beneficiary. Under Georgia law, where a life insurance policy holder is authorized to change the beneficiary, but no change is made prior to the insured's death, the named beneficiary—here, Mrs. Tate—has a vested interest in the policy proceeds. *Maxwell v. Britt,* 171 Ga.App. 230, 231, 319 S.E.2d 88 (1984). If, however, the owner of the policy demonstrates that he attempted to name a different beneficiary, but was prevented from doing so—for example, because of an administrative glitch over which the owner had no control—the change will be deemed effective. *Id.* In other words, the party holding the power to change the beneficiary designation must substantially comply with the requirements set forth in the insurance policy before a court will enforce the rights of the new beneficiary. *Id.*

In this case, upon Mr. Tate's departure from employment in December, 1989, AAA asked Propes what could be done to preserve its initial $5000.00 investment. After consideration of the three proposed options, AAA decided to name itself the beneficiary of the Policy. In order to change the beneficiary designation, First Capital requires that the policy owner complete a Designation Form and return it to the insurance company; the First Capital registrar must then sign it to render the change effective. Accordingly, Mr. Hall filled out the necessary document in Propes' office to effectuate the intent to change the designation. He entrusted the Designation Form to Propes, and it was the mutual understanding of the parties that Robinson–Humphrey would ensure that the form reached First Capital. As a result of the negligence of someone at Robinson–Humphrey, however, the latter did not send the form to First Capital at the time it was tendered by AAA in January of 1990. Instead, it was only after the death of Mr. Tate in October of 1991 that the error was discovered.

The Court concludes that sending in the change of beneficiary designation form by Robinson–Humphrey was a mere "ministerial action" needed to complete the desired change. Because AAA did all that it could

possibly have done to change the named beneficiary of the Policy, it met the requirements set forth in *Maxwell v. Britt,* 171 Ga.App. 230, 319 S.E.2d 88 (1984), and the change was effective.

Accordingly, because AAA owned the Policy at all times and took substantial steps to effectuate a change of beneficiary to itself, AAA is entitled to the proceeds under state law.

### 3. Analysis of Parties' Entitlement to Proceeds under ERISA

#### a. Background

Tate argues, however, that even though AAA may never have intended to create an ERISA plan—and, in fact, its express intent to its financial advisor was not to do so—it inadvertently created a plan that is covered by ERISA either as an employee welfare benefit plan or an employee pension plan. Accordingly, Tate continues, if an ERISA plan existed, the disposition of this case pursuant to state law is irrelevant as ERISA case authority would preempt state law under the principles discussed *supra* at 8.

As defined by ERISA, an employee welfare benefit plan is a plan that is provided for employees for the purpose of providing benefits in the event of sickness, accident, disability, death, or unemployment, though the purchase of insurance or otherwise. *See* n. 5 *supra.* The Court assumes that the purchase of life insurance in this case constituted a welfare benefit plan and, indeed, Judge Hall likewise concluded in a prior order.

Tate argues that the insurance contract also constitutes a pension benefit plan. A pension benefit plan, by its express terms or as a result of surrounding circumstances, provides retirement income to employees or results in a deferral or income by employees until their termination or thereafter. *See* n. 6 *supra.* It is true that the policy could potentially accumulate a cash value after a period of years and that whenever such a value had accumulated, the owner of the policy could cash in the policy and receive these proceeds.[11] Conceivably, if Mr. Tate

11. The policy must be held for a number of years, however, before its cash value would be

were the owner at the time the policy had accumulated a cash value, he could cash out the policy and use that income for retirement income or for any other purpose he chose. It is also true that the Resolution uses the term "retirement." [12]

The Court nevertheless finds it a greater stretch to argue that this purchase of an insurance policy by AAA constituted a pension benefit plan for Billy Tate, as opposed to a welfare benefit plan. The Court has found no case that holds that the purchase of a life insurance policy in these circumstances constitutes a pension benefit plan. Moreover, this insurance policy with a speculative, future, and presumably small cash value does not resemble, in any practical sense, the type of pension or annuity plan that this Court believes Congress to have envisioned as a pension benefit plan. (*See Murphy v. Inexco Oil Co.* 611 F.2d 570, 575 (5th Cir.1980)) (Statutory definition of employee pension benefit plan should "not be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach. Any outright conveyance of property to an employee might result in some payment to him after retirement," but might not constitute a plan under ERISA.) [13] Nevertheless, as with the welfare benefit classification, the Court will assume that this life insurance policy constituted a pension benefit plan under ERISA. Further, consistent with these assumptions, the Court will also assume that during the time Mr. Tate was

employed at AAA he was a participant in the Plan and Mrs. Tate was a beneficiary.[14]

All those assumptions having been made, Tate argues that AAA created an employee benefit plan (either welfare, pension, or both) that is governed by ERISA, that Mr. Tate's rights in the Plan had vested, and that AAA violated several substantive provisions of the statute in attempting to change the Policy beneficiary designation. Specifically, Mrs. Tate alleges violations of: (1) 29 U.S.C. § 1103(c), which forbids an employer from taking benefits from the assets of a plan, (2) 29 U.S.C. § 1104(a)(1)(A), which requires that a plan fiduciary act for the exclusive purpose of benefitting a plan's participants, (3) 29 U.S.C. § 1104(a)(1)(D), which requires plan administrators to follow strictly the amendment procedures outlined in the plan's documents,[15] and (4) 29 U.S.C. § 1055(a)(2), which requires a covered pension plan to provide a "qualified preretirement survivor annuity" to the surviving spouse of a vested participant who dies prior to the date on which his annuity starts.

Under 29 U.S.C. § 1132(a), a participant or beneficiary is empowered to bring a civil action "to recover benefits due to him under the terms of his plan ..." or to obtain equitable relief to redress violations of ERISA or enforce the terms of an ERISA plan. 29 U.S.C. §§ 1132(a)(1)(B), (a)(3). Congress enacted ERISA in order to "protect the interests of participants in employee benefit plans

---

worth any significant amount because of charges applied upon surrender. For example, although the cash value may appear as $3400.00 on the owner's statement, the cash value upon full surrender of the policy would not exceed a few dollars. (*See* Transcript at 114, 127, 132.)

**12.** The Resolution states, in part:
   1. To obtain a Non–Qualified Executive *Retirement Plan* for ... key personnel....
   ....
   3. The purpose will be tax breaks for the Corporation and *retirement* benefits to employees.
   (emphasis added)

**13.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981.

**14.** A participant is defined by statute as:

   any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

   A beneficiary is defined by statute as:
   a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.
   29 U.S.C. § 1002(7) & (8).

**15.** Tate contends that the Plan documents consist of the Resolution and the Policy. The Policy provides the procedures the owner must follow in order to change the beneficiary designation.

and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information ..." and "to protect ... the interests of participants in private pension plans and their beneficiaries" by requiring such plans "to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance." 29 U.S.C. § 1001(b), (c).

As the Supreme Court has explained: "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) (citations omitted). Congress enacted ERISA to guarantee, for example, that " 'if a worker has been promised a defined pension benefit upon retirement—*and if he has fulfilled whatever conditions are required to obtain a vested benefit*—he will actually receive it.' " *Pension Ben. Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 719, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984) (quoting *Nachman Corp. v. Pension Ben. Guar. Corp.,* 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980)) (emphasis added).

Whether or not an ERISA plan was created and, if so, the type of plan created is not controlling here, however, as the Court concludes that the dispositive issue in this case is whether Mr. Tate vested in a plan. If Mr. Tate failed to vest according to the terms of his private agreement with AAA (in the case of an employee welfare benefit plan), or meet either the minimum vesting requirements imposed by ERISA or by the Plan (in the case of an employee pension benefit plan), Tate has neither a basis for claiming entitlement to the insurance proceeds from First Capital, nor a cause of action against AAA for violation of the statute.

**b. *Did Mr. Tate have a Vested Interest in the ERISA Plan?***

**1. *Vesting Requirements if the Plan is an Employee Welfare Benefit Plan***

The Court must then determine whether Billy Tate had a vested interest in the plan.[16] With regard to a welfare benefit plan, "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits." *Curtiss–Wright Corp. v. Schoonejongen,* —— U.S. ——, ——, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995); Furthermore, the statute does not require that a welfare plan's benefits vest. *Alday v. Container Corp. of America,* 906 F.2d 660, 663 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991). Congress did not provide for vesting requirements on employee welfare benefit plans so as to afford employers more flexibility in designing and modifying such plans and to avoid complicating the administration of plans whose primary purpose is to provide retirement income. *In re Unisys Corp. Retiree Medical Benefits "ERISA" Litig.,* 58 F.3d 896, 901 (3rd Cir.1995).

While ERISA imposes no vesting requirements for employee benefit plans, "a court may look to the parties' intent to determine [if and] when vesting should occur. Such intent may be demonstrated by 'agreement or by private design.' " *International Resources v. New York Life Ins. Co.,* 950 F.2d 294, 301 (6th Cir.1991) (quoting *In re White Farm Equipment Co.,* 788 F.2d 1186, 1193 (6th Cir.1986)), *reh'g en banc, denied,* Jan. 15, 1992, *cert. denied,* 504 U.S. 973, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992). The plan participant or beneficiary bears the burden of proving, by a preponderance of the evidence, that the employer intended the welfare benefits to vest. *In Re Unisys Corp.,* 58 F.3d at 903 (citing *Howe v. Varity Corp.,* 896 F.2d 1107 (8th Cir.1990)).

---

**16.** In his order of September 12, 1994, Judge Hall denied Tate's motion for summary judgment because he found that, *inter alia,* a genuine issue of material fact existed with regard to whether Mr. Tate's rights to the Policy had vested.

In an earlier order dated August 27, 1993, however, Judge Hall had observed that it appeared that Mr. Tate had indeed vested in the Plan. The Court deems this observation to be dictum, however, for his later determination, in the September 12, 1994 order, that there was an ambiguity with regard to whether Mr. Tate had vested, was essential to the denial of Tate's motion for summary judgment on that issue.

In this case, the Court will assume that the corporate resolution constitutes an agreement that contemplates employee vesting after completion of "five years of continuous service with [the] Corporation." Tate argues that the Resolution language is unambiguous in its requirement that the employee only had to provide five years—any five years—of continuous service and that because her husband had "five years of continuous service", he was vested.

Where language is capable of more than one reasonable interpretation, it is ambiguous. *Stewart v. KHD Deutz of America, Corp.*, 980 F.2d 698 (11th Cir.1993) (citing *International Bhd. of Boilermakers v. Local Lodge D111*, 858 F.2d 1559 (11th Cir.1989)) (where plaintiff properly alleged ambiguity in collective bargaining agreement subject to two possible interpretations). Without a clear reference to the starting date from which the five years would run, the Court finds that each party's interpretation is reasonable. The Resolution language with respect to the vesting requirements of the plan is therefore ambiguous.

Where an ERISA plan is ambiguous, "[t]he issue becomes one of contract interpretation, and, if necessary, a consideration of the relevant extrinsic evidence and the parties' course of dealing." *Williams v. Wright*, 783 F.Supp. 1392, 1397 (S.D.Ga.1992) (citation omitted). *See also Stewart*, 980 F.2d 698 (11th Cir.1993) (where labor contracts regarding ERISA plan coverage were ambiguous, district court should have examined extrinsic evidence to resolve ambiguity); *In Re Unisys Corp.*, 58 F.3d 896 (3rd Cir. 1995) (extrinsic evidence is properly considered if an ERISA plan is ambiguous). Further, effect should be given to all of a contract's provisions wherever possible. *Stewart*, 980 F.2d at 703 (citing *Guaranty Financial Servs. v. Ryan*, 928 F.2d 994, 999 (11th Cir.1991)).

An examination of the Resolution language and extrinsic evidence reveals that AAA clearly intended to require that an employee must continue to work at AAA for five additional years from the inception of the Plan in order to acquire ownership of the Policy. First, as a technical matter, AAA was not formed until April of 1988, so that no employee could have obtained five years of service as of the effective date of the Plan. More significantly, the Resolution states that AAA wished to create a benefit plan to build longevity in employment. That clause cannot be given effect under Tate's logic that he was vested on the date that the resolution was passed. In addition, the language stating that vesting would occur if Mr. Tate "remains" in AAA's employ for five years suggests a requirement of future service. If Mr. Tate's prior years of service were taken into account, then the Plan's forward-thinking purpose is a nullity.

Moreover, the parties' conduct indicates an understanding that five (5) additional years of service was required, for if Mr. Tate had been vested, then presumably *his* name would have appeared on the Policy as the owner. The fact that AAA was listed as the owner from the outset suggests the intent that Mr. Tate's years of service up until the adoption of the Plan did not count towards the vesting of the Policy. Further, AAA retained physical control over the policy document at all times.[17] In addition, upon Tate's termination, AAA would not have offered to *sell* the Policy to him, had he already been the owner.[18] That Billy Tate concurred with AAA's belief that it owned the policy is confirmed by Propes' testimony that Mr. Tate affirmatively declined an offer to be-

---

17. Further evidence of AAA's ownership of the plan is the fact that the corporation paid the Tates $1050.00 to offset the tax liability incurred as a result of the Internal Revenue Service imputing the $5000.00 premium paid by AAA as income to the Tates. While the IRS may have imputed the $5000.00 as income in the form of a fringe benefit to the Tates, the reality was that AAA paid that money to purchase the Policy, was listed as the owner of the Policy, and reimbursed the Tates for the tax liability imposed. The result was that the Tates had no incidence of ownership with respect to the Policy as they paid nothing into it and were reimbursed for the tax liability that the Internal Revenue Service imposed.

18. Mr. Altman, counsel for Mrs. Tate, also noted that Mr. Tate had the option to *purchase* the policy, which again demonstrates the former employee's lack of ownership of the policy at the time he left AAA. (Transcript at 121.)

come the owner of the Policy. Presumably, Mr. Tate would likely have asserted ownership of the Policy once he was terminated, if his understanding of the vesting terms had been different from that of AAA.

The Court concludes that AAA's giving an immediate vested interest in the Plan/Policy to Mr. Tate would be more akin to AAA bestowing a gift upon a dedicated employee for *past service*, rather than providing an incentive for him to continue with the Corporation. Although the owner of the insurance policy at the time of the implementation of the Plan, AAA simply allowed Mr. Tate to name the beneficiary while he remained employed with the Corporation. Had Mr. Tate remained employed at AAA for five additional years, he would have owned the policy outright and, accordingly, had a right to name the beneficiary. Once Mr. Tate left defendant AAA's employ, however, he retained no rights to the Policy, having failed to fulfill the requirements under the Plan.

A final discussion on the construction of this Resolution language: Tate argues that if the Court construes the language of the Resolution to be ambiguous, it should apply the federal common law rule of construction—*contra proferentem* or "construe against the drafter"—to find that Mr. Tate's rights to the insurance policy had vested. That is, because AAA caused the Resolution to be drafted, it should lose in the event of any ambiguity. The Court, however, declines to construe the Resolution against AAA for the above reasons and for the following additional reasons.

■■■ Where ERISA is silent as to a particular issue and the relevant state law is preempted, federal courts may, *in appropriate circumstances*, develop a federal common law. *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 562 (4th Cir.1994) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109–111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989)) (emphasis added). ERISA is silent as to the proper rules of construction to be applied in construing the terms of a plan, and state law should thus ordinarily be preempted, as the "construction" of a plan necessarily "relates to" a plan. *See* 29 U.S.C. § 1144(a).

First, in declining to apply as federal common law in this case the rule of construction that Tate seeks, the Court notes that the Eleventh Circuit has yet to adopt such federal common law regarding contract construction under ERISA. Instead, extrinsic evidence has been permitted to resolve ambiguities in contracts pertaining to employment issues. *See Stewart v. KHD Deutz of America, Corp.*, 980 F.2d 698 (11th Cir.1993). Moreover, the standard of review applied by the appellate court for examining determinations made by the district court depends on whether the lower court used extrinsic evidence to resolve an ambiguity in a plan. *Id.*

■■■ Second, "resort to federal common law generally is inappropriate when its application would: 1) conflict with the statutory provisions of ERISA; 2) discourage employers from implementing plans governed by ERISA; or 3) threaten to override the explicit terms of an established ERISA benefit plan." *Phoenix*, 30 F.3d at 563 n. 21 (4th Cir.1994) (citing *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir.1992)).

■■■ Under the facts of this case, the Court concludes that the application of *contra preferentem* is inappropriate. Imposing the rule against small employers who are unsophisticated drafters, as was AAA, will likely discourage them from creating plans. Here, AAA intended to provide a benefit to Mr. Tate had he met AAA's requirement of remaining employed for five additional years. None of ERISA's policies advocate forcing an employer to permit vesting of welfare benefits before the employer so intends. Moreover, the application of the rule construing the Resolution against AAA would "threaten to override the explicit terms" of the Plan in that the Resolution taken as a whole can be read to explicitly require that an employee stay for an additional five years before earning ownership of the Policy.

Third, the circuits that have adopted the rule of *contra proferentem* have applied it to facts entirely distinguishable from those in this case. In those cases, an insurance company had drafted the policy and the rule was applied to determine the scope of coverage

under the ambiguous policy, not the fact of coverage, as in this case.

Accordingly, the Court declines to resort to federal common law when to do so defeats ERISA's policy of allowing the employer some flexibility with vesting requirements to discern the employer's intent in establishing a definite vesting requirement for this type of plan.

In summary, analyzing the insurance contract as a welfare benefit plan, the Court concludes that Mr. Tate's interest in the policy had not vested either at the inception of the policy or at the time of his death. Conversely, Mrs. Tate may not claim entitlement to the Policy, based upon her husband's service with AAA, as she has failed to demonstrate by a preponderance of the evidence that AAA intended that Mr. Tate's rights in the Plan vested immediately under the Resolution.

This result is in keeping with ERISA's policy goals, for "[r]ather than enabling employees to get 'something for nothing'—ie. to receive present benefits for anticipated future years of employment which have not actually been and may never be worked— ... the essential purpose of ERISA is to prevent employees from getting 'nothing for

something'—to prevent them from receiving fewer benefits than those they accrue through years of service." *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1176 (11th Cir.1988).

### 2. Vesting Requirements if the Plan is an Employee Pension Benefit Plan

Tate has argued that the Plan created by AAA is also an employee pension benefit plan. ERISA imposes greater regulation on this type of plan to afford employees protection by "improving the equitable character and the soundness of [private pension] plans by requiring [employers] to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance." 29 U.S.C. § 1001(c). To effect that protection, Congress requires the vesting of retirement benefits in accordance with one of three schedules. 29 U.S.C. § 1053.[19] These schedules reflect what Congress deems adequate employee protection and serve as a floor, rather than as a ceiling to vesting, enabling an employer to provide for earlier vesting should it so desire. *See generally* 29 U.S.C. § 1001(c).

The Court will first determine whether Mr. Tate vested under any of the statutory

---

**19.** The statute states in relevant part:

**§ 1053. Minimum vesting standards**
   **(a) Nonforfeitability requirements**
Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.
   **(1)** A plan satisfies the requirements of this paragraph if an employee's right in his accrued benefit derived from his own contributions are nonforfeitable.
   **(2)** A plan satisfies the requirements of this paragraph if it satisfies the requirements of subparagraph (A), (B), or (C).
   **(A)** A plan satisfies the requirements of this subparagraph if an employee who has completed at least 5 years of service has a nonforfeitable right to 100 percent of his accrued benefit derived from employer contributions.
   **(B)** A plan satisfies the requirements of this subparagraph if an employee has a nonforfeitable right to a percentage of the employee's accrued benefit derived from employer

contributions determined under the following table:

| Years of service: | Nonforfeitable percentage |
| --- | --- |
| 3 | 20 |
| 4 | 40 |
| 5 | 60 |
| ... | |

   **(C)** A plan satisfies the requirements of this subparagraph if—
   **(i)** the plan is a multiemployer plan (within the meaning of section 3(37), and ...
29 U.S.C. § 1053(a) (as amended effective December 31, 1988)).
   The term "year of service" means, "a calendar year, plan year, or other 12–consecutive month period designated by the plan ... during which the participant has completed 1,000 hours of service." 29 U.S.C. § 1053(b)(2)(A). The Plan is silent with regard to which period should be used. The Court will choose the method most favorable to defendant Tate (the "plan year" period) for the analysis, although Mr. Tate does not meet any of the minimum requirements for vesting. A "year of service" will be defined as the 12–month period beginning with December 19, 1988, the effective date of the Plan.

schedules. If he did not, the Court will then determine whether the Plan itself provided for vesting earlier than the statute required.

■ Despite ERISA's goal of protecting workers from a denial of entitled benefits, it is clear that an employer retains the authority to cancel benefits not mandated by ERISA's minimum vesting requirements. *Fentron Industries, Inc. v. National Shopmen Pension Fund,* 674 F.2d 1300, 1305 (9th Cir.1982) (citing *Hummell v. S.E. Rykoff,* 634 F.2d 446, 449–50 (9th Cir.1980)); *Fremont v. McGraw–Edison Co.,* 606 F.2d 752 (7th Cir. 1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980). *See also Penn v. Howe–Baker Engineers, Inc.,* 898 F.2d 1096 (5th Cir.1990). Additionally, Section 1053(b)(1)(C), permits the employer to exempt from its "years of service" calculation, the employee's service prior to the implementation of a plan. 26 C.F.R. § 1.411(a)–5. Thus, there is no statutory requirement for counting Mr. Tate's prior service with AAA/Georgia Construction in determining whether any benefits had vested.

■ Assuming *arguendo* that AAA had indeed created an employee pension benefit plan, Mr. Tate failed to qualify for vested benefits under any of the three schedules provided by Congress in section 1053. He fails to meet the requirements of subparagraph (A) because he did not have five (5) years of service from the point the Plan was maintained; he fails the requirements of subparagraph (B) because he did not have a minimum of three (3) years of service from the time the Plan was effectuated; lastly, the terms of subparagraph (C) are not met as they apply to multi-employer plans.

Although it is possible for a plan to provide for earlier vesting than section 1053 requires, the Court has already determined that the language of the Resolution required Mr. Tate to remain employed by the Halls for an additional five year period. The Plan, therefore, provided no opportunity for vesting prior to the statutory mandate for employee pension benefit plans.

Therefore, under the statute and the Plan, no benefits vested in Mr. Tate either prior to or after his termination. Because Mr. Tate acquired no rights under the Policy as of the date of his termination, AAA remained the owner of the Policy and, as such, had the power to change the beneficiary designation. (See Policy at 5.)

Even under ERISA, which was enacted to provide protection to employees, it is recognized that an employer has the right to modify or terminate a nonvested benefit. *Phillips v. Amoco Oil Co.,* 799 F.2d 1464 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987); *Owens v. Storehouse, Inc.,* 984 F.2d 394, 397 (11th Cir.1993) ("ERISA does not prohibit a company from terminating previously offered benefits that are neither vested nor accrued."); *Penn v. Howe–Baker Engineers, Inc.,* 898 F.2d 1096 (5th Cir.1990). None of the sections cited by Tate prevent an employer to withdraw or control assets which did not vest in a former participant of its plan.

Once Mr. Tate left AAA, he was no longer a participant in the Plan and Tate was no longer a potential beneficiary. *See Crawford v. Roane,* 53 F.3d 750, 756 (6th Cir.1995) ("general rule [is] that a person who terminates his right to belong to a plan cannot be a 'participant' in the plan"). Tate, therefore, has no power, under ERISA's civil enforcement provision, section 1132, to seek relief for violations under 29 U.S.C. §§ 1103–04 or 1055.

The Court therefore holds that, as owner of the Policy, AAA was free to elect a new beneficiary and the exercise of that right did not constitute a misuse of plan assets in violation of section 1103(c) of the Code or a breach of fiduciary duty violation of section 1104(a)(1)(A) of the Code. Moreover, AAA's act of changing the beneficiary designation was not an amendment to the Plan, as Tate had attempted to characterize it, and therefore, AAA did not violate section 1104(a)(1)(D). Lastly, as Mr. Tate did not vest, section 1055 is irrelevant.

### 3. *Did AAA Effectively Change the Policy Beneficiary?*

Because Mr. Tate left AAA's employ without having any vested rights to benefits under either Plan, thus nullifying the substantive ERISA violations Tate has alleged, the

Court finds that Tate's single remaining viable argument for entitlement to the Policy proceeds under ERISA is that AAA's attempt to change the beneficiary was ineffective under ERISA or federal common law. Georgia's state law doctrine of substantial compliance is preempted, for the determination of a beneficiary under ERISA "relates to" an employee benefit plan. *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 563 (4th Cir.1994); *Brown v. Connecticut Gen. Life Ins. Co.*, 934 F.2d 1193 (11th Cir.1991). Moreover, ERISA contains no provision prescribing the proper effect to be given an attempt to change a beneficiary designation on a life insurance policy.

■■■ "When state law has been preempted and ERISA is silent on the matter, federal common law may, in certain instances, be applied." *Phoenix*, 30 F.3d at 563. Application of federal common law is appropriate under the present circumstances, as (1) it would not conflict with ERISA's statutory provisions; (2) it poses no danger that employers would be discouraged from creating ERISA plans, and (3) it poses no threat to the explicit terms of an ERISA plan. *See Id.* at 563 n. 21. Although state law is preempted, federal courts may "draw on state common law in shaping the applicable body of federal common law." *Id.* at 564.

■■■ Georgia case law has established a substantial compliance doctrine which is similar to the federal common law applied by the *Phoenix* court. The federal common law doctrine of substantial compliance was defined by the district court in *Phoenix* as follows:

> [P]ursuant to federal common law, an insured substantially complies with the change of beneficiary provisions of an ERISA life insurance policy when the insured: (1) evidences his or her intent to make the change and (2) attempts to effectuate the change by undertaking positive action which is for all practical purposes similar to the action required by the change of beneficiary provisions of the policy.

*Phoenix Mut. Life Ins. Co. v. Adams*, 828 F.Supp. 379, 388 (D.S.C.1993).

Applying that principle here, the Court concludes that AAA manifested an intent to change the beneficiary and took a decisive step towards effectuating that intent by completing the Designation Form on January 25, 1990 in Robinson–Humphrey's offices. AAA was not responsible for sending the Designation Form to First Capital, as Propes and Robinson–Humphrey had assumed that responsibility. The only missing link in this chain, then, was the failure by Propes' office to send in the document before Mr. Tate's death. The Court concludes, however, that Robinson–Humphrey's mistake should not prejudice AAA's rights. Because AAA substantially complied with the procedures set forth by First Capital in effecting a change of beneficiary designation, the attempted change was effective to replace defendant Tate as the beneficiary.

## II. *Penalty For Failing To Provide Plan Description*

### A. *Findings of Fact and Conclusions of Law*

1. The Court also assumes, without deciding, that ERISA governs the Plan for purposes of analyzing Tate's claim under 29 U.S.C. § 1132(c).

2. Tate asks this Court to impose a penalty on AAA for failing to comply with 29 U.S.C. § 1024(b)(4), one of ERISA's disclosure provisions.

3. Congress enacted the ERISA disclosure provisions to ensure that "the individual participant knows exactly where he stands with respect to the plan." *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 118, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989) (quoting H.R.Rep. No. 93–533, p. 11 (1973), reprinted in 1974 U.S.Code Cong. & Admin.News 1974, pp. 4639, 4649).

4. 29 U.S.C. § 1024(b)(4) requires a plan administrator to furnish a participant or beneficiary with a "summary plan description" upon written request.

5. Under 29 U.S.C. § 1132(c), a plan administrator may be fined for failing or refusing to furnish a participant or beneficiary with requested information which the administrator is under duty to supply. A district

court may, in its discretion, impose a penalty of $100 a day for the infraction, measured from thirty (30) days after the request was made.

6. An administrator is defined as:

(i) the person specifically so designated by the terms of the instrument under which the plan is operated;

(ii) if an administrator is not so designated, the plan sponsor; or

(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).

7. As the Resolution does not name an administrator, AAA is presumed to be the administrator as the plan sponsor.

8. The Court first determines whether Tate was a beneficiary at the time the request for a summary plan description was made on her behalf. Only participants and beneficiaries are entitled to request and receive information pursuant to 29 U.S.C. § 1024(b)(4). *See Anderson v. Flexel, Inc.,* 47 F.3d 243, 246 (7th Cir.1995).

9. In 1990, the Tates employed an accountant, Mr. Joseph Fumei, to find out why Mr. Tate's 1988 W–2 form from AAA reflected income above his normal salary by $6050.00.

10. On September 24, 1990, Mr. Fumei wrote AAA and asked for information about the $6050.00 and requested a "summary plan description" for the Plan.

11. On October 15, 1990, Mrs. Hall responded in writing stating that "[AAA] w[as] not instructed by the agent or [its] CPA to provide a Summary Plan Description. [AAA] do[es] not have a Summary Plan Description."

12. As determined by this Court, even if AAA had created an ERISA plan, Mr. Tate ceased to qualify as a participant in the Plan as of December 1989.

13. The written request for information was not made until September 24, 1990.

14. Tate may therefore not claim rights under the enforcement provision of 29 U.S.C. § 1132(c).

15. Moreover, in order to prevail in an action under 29 U.S.C. § 1132(c), the participant or beneficiary must demonstrate that he or she has been prejudiced by the administrator's failure to supply information. *See Zittrouer v. Uarco Inc. Group Ben. Plan,* 582 F.Supp. 1471, 1477 (N.D.Ga.1984) (citations omitted).

16. Tate has presented no evidence demonstrating that she has been prejudiced by AAA's failure to provide her with a summary plan description.

### CONCLUSION

For the foregoing reasons, the Court grants judgment for defendant AAA.

SO ORDERED.