**In re AMERICAN STEEL PRODUCT, INC., Debtor.**

**Anne R. MOORE, Trustee, Plaintiff,**

**v.**

**John C. EMERY, Jr., Defendant.**

**Bankruptcy No. 96–60525.**
**Adversary No. 96–06025A.**

United States Bankruptcy Court,
S.D. Georgia,
Statesboro Division.

Dec. 19, 1996.

William L. Rothschild, Trustee, Atlanta, GA.

Charles C. Stebbins, III, Warlick, Tritt & Stebbins, Augusta, GA, for Defendant.

### ORDER

JOHN S. DALIS, Chief Judge.

Anne R. Moore ("Trustee"), the Chapter 11 Trustee for American Steel Product, Inc. ("American Steel") filed this four count adversary proceeding against John C. Emery, Jr.; Count I to determine Mr. Emery's interest in equipment ostensibly leased to American Steel, Count II to avoid Mr. Emery's security interest in the equipment, Count III for an alleged fraudulent transfer, Count IV for breach of contract, and Count V for an injunction preventing Mr. Emery from removing any of the equipment from American Steel's possession. At trial, Mr. Emery moved to dismiss Counts III and IV, asserting that the Trustee failed to introduce evidence supporting these claims. Mr. Emery's motion to dismiss Count III was granted, leaving the Trustee opportunity to address Count IV in her post trial brief. Because the Trustee did not address this issue, Count IV is also dismissed. Based upon the evidence presented at trial and my review of relevant statutes and case law, judgment is granted to the Trustee on counts I and II, and Count V is dismissed as moot. This matter constitutes a core proceeding subject to this court's jurisdiction under 28 U.S.C. § 157(a) & (b)(2)(A), (C), (H), (K) & (O) and § 1334.

This order includes my findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure (FRCP) 52, made applicable to bankruptcy proceedings under Federal Rule of Bankruptcy Procedure (FRBP) 7052.

Prior to December, 1994, American Steel owned equipment necessary to American Steel's manufacturing operations in Farmingdale, New York. In 1994, American Steel sought investors to raise additional working capital to finance its operations. American Steel spoke with representatives of Mr. Emery concerning the opportunity to invest in American Steel. Mr. Emery agreed to invest money in American Steel, but insisted upon structuring the financing arrangement as a sale and lease back of equipment to generate passive investment income to offset passive income losses for income tax purposes. On December 16, 1994, Mr. Emery purchased certain specified items of American Steel equipment, executing an Asset Purchase Agreement and Bill of Sale and paying $250,000.00 to American Steel. On the same date, the parties executed an agreement titled "Agreement of Lease," ("Lease") ostensibly leasing the purchased equipment back to American Steel. The Lease provided, inter alia, that:

1. the lease would run for two years, from December 16, 1994 to December 16, 1996;

2. American Steel would pay rent of $37,500.00 per year;

3. American Steel could not transfer, assign, or sublet the equipment, nor could it permit any liens or encumbrances to attach thereto;

4. American Steel is responsible for all taxes, insurance and maintenance of the equipment;

5. American Steel bears the risk of loss or damage to the equipment during the lease period;

6. Mr. Emery retained title to the equipment throughout the lease;

7. after June 16, 1995, Mr. Emery had the option to sell the assets to American Steel for the fair market value of the equipment, which option to sell would expire upon termination of the lease or upon Mr. Emery's exercise of a warrant to pur-

chase 22,222 shares of MacGregor Group, Inc.[1] stock for $250,000.00; and

8. American Steel had the option to purchase the equipment for its fair market value, which option expired upon Mr. Emery's exercising his warrant to purchase stock or upon termination of the lease.

The parties contemporaneously executed a letter agreement, drafted by American Steel, providing that in the event the fair market value of the equipment fluctuates upwards or downwards by more than 10% between the execution of the lease and the exercise of either the purchase or sale option, the rent for the lease term "will be adjusted upward or downward to reflect the difference in the fair market value." A U.C.C. 1 form was not filed to perfect a security interest in the equipment.

Resolution of this case turns on whether the documents executed by the parties constitute a true lease or a disguised security agreement. If, as Mr. Emery asserts, the transaction is a true lease, he owns the equipment and is entitled to either performance of the lease obligations or rejection of the contract and a return of the equipment. See, 11 U.S.C. § 365. If, as the Trustee asserts, the transaction constitutes a disguised security agreement, Mr. Emery is left with an unperfected security interest in the equipment and an unsecured claim against American Steel. See, 11 U.S.C. §§ 541 & 544.

■ Georgia's choice of law provision determines which state law applies to interpret these documents. *United Counties Trust Co. v. Mac Lum, Inc.,* 643 F.2d 1140 (5th Cir.1981) (Federal courts should implement the choice of law rules of the state in which the court sits.). Georgia's choice of law provision allows parties to a commercial contract to specify any applicable state law if that law bears a reasonable relation to the transaction, but if no state law is specified, Georgia law will apply to any transaction "bearing an appropriate relation to this state." Official Code of Georgia (O.C.G.A.) § 11–1–105. Neither the Lease nor the Letter Agreement specifies under which state's substantive law the court should construe the transaction. At the time the parties executed these documents, American Steel, a Georgia corporation, maintained the equipment at its plant in Farmingdale, New York and Mr. Emery was a resident of Connecticut. In May and June of 1995, American Steel moved its plant operations, including the equipment at issue, from New York to Swainsboro, Georgia. Except for the equipment's previous location in New York, the parties failed to introduce evidence regarding any state other than Georgia bearing a reasonable relationship to the transaction. Because American Steel is a Georgia corporation and because the equipment is now located in Georgia, I will apply Georgia substantive law to determine the respective rights and obligations of the parties under the agreements.[2]

■ The U.C.C. defines a lease as "... a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease." O.C.G.A. § 11–2A–1031(j). Whether a transaction creates a security interest or a lease is determined by the particular elements of the transaction. The U.C.C. defines a per-se security interest and lists additional factors which may, but do not automatically, indicate a security agreement. O.C.G.A. § 11–1–201(37)[3]. If a transaction contains the ele-

---

**1.** American Steel was wholly owned by the MacGregor Group, Inc., a Delaware Corporation.

**2.** Although neither party has addressed the choice of law issue, both parties have argued their respective positions under Georgia's enactment and interpretations of the Uniform Commercial Code (U.C.C.) and under other state interpretations of identical provisions of the U.C.C.

**3.** O.C.G.A. § 11–1–201(37) provides in pertinent part:

"Security Interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.... Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest".....

Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the

ments of the per-se rule, the court's inquiry ends. However, if the transaction does not fit within the per-se rule, the court must analyze all of the relevant facts to determine whether the transaction creates a lease or a security interest.

To constitute a security interest as a matter of law, the "rent" paid by the lessee must continue for the entire term of the lease without the lessee holding an option to terminate the payments, and one of four factors listed in subsections (a)–(d) of § 11–1–201(37) must be present. The Trustee urges that the lease term is not cancelable prior to expiration of the initial period, and that American Steel is obligated to purchase the equipment at the end of the term, making this transaction a lease as a matter of law. The Trustee is incorrect. American Steel may terminate its lease obligation at any time by purchasing the equipment at its fair market value, removing this transaction from the operation of the per-se security agreement test. *See, In re Murray,* 191 B.R. 309 (Bankr.E.D.Pa.1996) *aff'd* 201 B.R. 381 (E.D.Pa.1996) (Lessee's ability to terminate lease payment obligations by purchasing equipment removes lease from operation of the per-se test.)

■ The Trustee alternatively emphasizes three characteristics of the transaction which she contends suggest that, although not satisfying the per se test, nonetheless create a security agreement: 1) the letter agreement adjusting the rental payments based upon the equipment's fair market value when American Steel purchases it from Mr. Emery; 2) the fact that Mr. Emery is not in the business of manufacturing or selling equipment of any kind, having only purchased this equipment for the express purpose of leasing it back to American Steel; and 3) Mr. Emery's unqualified right to sell the equipment to American Steel i.e. to require American Steel to buy back the equipment.

The Trustee asserts that the letter agreement is intended to raise the rental payments ab initio in the event the sale price of the equipment (its fair market value) fails to realize Mr. Emery's initial capital investment with an appropriate rate of interest return. The letter agreement from American Steel to Mr. Emery provides:

American Steel Product, Inc., as Lessee, has entered into a Lease Agreement with you, as Lessor, dated December 16, 1994, which provides for the lease to American Steel Product, Inc. of certain assets for an annual rental amount of $37,500.00, payable in monthly installment.

You have the Option to Sell the leased assets to American Steel Product, Inc. at fair market value and American Steel Product, Inc. has the Option to Purchase the leased assets from you at fair market value, in accordance with the terms of the Lease Agreement.

By this letter, we irrevocably agree that if the fair market value of the leased assets

---

lease not subject to termination by the lessee, and

(a) The original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become owner of the goods;

(c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a security interest merely because it provides that:

(a) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(b) The lessee assumes the risk of loss of the goods, or agrees to pay taxes, insurance, filing, or registration fees, or service or maintenance costs with respect to the goods;

(c) The lessee has an option to renew the lease or become the owner of the goods;

(d) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(e) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

.      .      .      .      .

has increased or decreased by more than 10% from the time of execution of the lease to the time that either party exercises its Option to Sell or Option to Purchase, then the rental will be adjusted upward or downward to reflect the difference in the fair market value.

This agreement cannot be changed without the mutual consent of you and American Steel Product, Inc.

The letter was signed on behalf of American Steel and by Mr. Emery as "Accepted and Agreed."

According to the Trustee, the letter agreement was intended to guarantee Mr. Emery a minimum rate of return on his investment which was in reality a loan. Under the Trustee's analysis the return on Mr. Emery's loan was 15% per annum ($37,500.00 per year "rent" divided by the $250,000.00 "investment", or loan as characterized by the Trustee, equals a 15% annual return) and the letter agreement was designed to guarantee Mr. Emery not less than a 10% return. The Trustee shows the following example. Assuming that either Mr. Emery exercised his option to sell or American Steel exercises its option to purchase at the end of the two-year term of the lease, American Steel would have paid Mr. Emery $75,000.00 rent under the Lease Agreement and assuming that the fair market value of the equipment is equal to Mr. Emery's initial investment of $250,-000.00, Mr. Emery will receive a total of $325,000.00, $250,000.00 return of his original investment plus $75,000.00 rent equalling an effective 15% per annum return. If the equipment has a fair market value at the end of the lease, the time the option is exercised under the example, of $150,000.00 Mr. Emery would have received his $75,000.00 rental under the Lease Agreement, $150,000.00 return of his initial investment; and, according to the Trustee's analysis an additional $100,-000.00 as retroactive rent for a total return of $325,000.00 thus preserving Mr. Emery's 15% per annum return. Assuming, under the Trustee's analysis, at the end of the lease a fair market value of $225,000.00, a 10% decrease in value, Mr. Emery would have received his two year's rent of $75,000.00 plus a return of his initial investment of only $225,000.00 for a total of $300,000.00 representing an effective $50,000.00 return on his initial investment of $250,000.00, 10% per annum. Expanding the Trustee's example, if the fair market value at the end of the lease was $300,000.00 and Mr. Emery had received $75,000.00 of rent under the Lease Agreement, this rent would be reduced retroactively by $50,000.00 by way of setoff against the repurchase price resulting a total return of rent and capital investment to Mr. Emery of $325,000.00, a 15% per annum return. Under the Trustee's analysis the letter agreement had the purpose and effect of capping Mr. Emery's return on his loan at 15% per annum and guaranteeing him not less than a 10% return regardless of the fair market value of the equipment.

According to Mr. Emery, the letter agreement is subject to another reasonable interpretation, that based upon the fair market value at the exercise of the option by either American Steel or Mr. Emery the rental would be adjusted upward or downward in the same proportion as any increase or decrease in fair market value from the amount of Mr. Emery's initial investment of $250,-000.00. Although Mr. Emery did not expand upon this possible meaning, by way of example, his theory can be demonstrated. Under the terms of the Lease Agreement Mr. Emery is to receive $75,000.00 in total rent over two years representing a 15% per annum return on his initial investment of $250,-000.00. If at the end of the lease the option is exercised and the fair market value of the equipment is only $150,000.00 Mr. Emery is entitled only to a 15% return on $150,000.00 or $45,000.00 in total rental. Mr. Emery is entitled only to receive a total of $195,000.00 ($150,000.00 fair market value plus total rental of $45,000.00) or a final payment under the option of $120,000.00 [$150,000.00 fair market value less $30,000.00 ($75,000.00 rent paid less $45,000.00 actual rent due) ]. If the fair market value of the equipment at the end of the lease is $300,000.00, Mr. Emery would have received his rent under the Lease Agreement of $75,000.00 plus fair market value of $300,000.00 plus an additional rental of $15,000.00 (15% per annum return on $300,000.00 = $45,000.00 per year or $90,-000.00 over two years less $75,000.00 previ-

ously paid) for a total return to Mr. Emery of $390,000.00. Under this analysis the letter agreement was intended to provide Mr. Emery with a 15% annual return, not on his investment, but on the fair market value of the equipment on the date the Option to Sell or Option to Purchase was exercised.

▌ Under applicable Georgia law, "[t]here are three steps in the process of contract construction. The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (O.C.G.A. § 13–2–2); if after doing so the trial court determines that an ambiguity still remains, the jury [finder of fact] must then resolve the ambiguity."[4] *Karlan, Inc. v. King,* 202 Ga.App. 713, 415 S.E.2d 319, 321 (1992), quoting *Travelers Ins. Co. v. Blakey,* 180 Ga.App. 520, 349 S.E.2d 474 (1986). From the Trustee's and Mr. Emery's analysis of the letter agreement there is an obvious uncertainty of meaning in the agreement establishing an ambiguity. The letter agreement specifies that the rent payments will be increased or decreased retroactive to the beginning of the lease term if the fair market value of the equipment increases or decreases by more than 10%. However, the letter agreement fails to specify whether the rent payment adjustment will bear a direct or inverse relationship to the increase or decrease of the equipment's value. If the parties intended to increase the rent when the fair market value decreases, as suggested by the Trustee, then the letter agreement would appear to be intended to guarantee Mr. Emery the return of his initial investment and a minimum rate of return on the investment, similar to a security arrangement. If, on the other hand, the parties intended to decrease the rent in the event the fair market value decreased to reflect the lower than expected rental value of the equipment, the agreement is not inconsistent with a lease.

▌ Obviously, the letter agreement was intended as an addendum to the Lease as, under either interpretation, the letter agreement affected the amount of rent ultimately paid. As the letter agreement "was not intended to speak the whole contract," parol evidence is admissible to ascertain the intention of the parties. O.C.G.A. § 13–2–2(1) & § 13–2–3[5]. Although as emphasized

4. O.C.G.A. § 13–2–2 provides:

The following rules, among others, shall be used in arriving at the true interpretation of contracts:

(1) Parol evidence is inadmissible to add to, take from, or vary a written contract. All the attendant and surrounding circumstances may be proved and, if there is an ambiguity, latent or patent, it may be explained; so, if only a part of a contract is reduced to writing (such as a note given in pursuance of a contract) and it is manifest that the writing was not intended to speak the whole contract, then parol evidence is admissible;

(2) Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning. The local usage or understanding of a word may be proved in order to arrive at the meaning intended by the parties;

(3) The custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract, except in regard to those transactions covered by Title 11;

(4) The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part;

(5) If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred;

(6) The rules of grammatical construction usually govern, but to effectuate the intention they may be disregarded; sentences and words may be transposed, and conjunctions substituted for each other. In extreme cases of ambiguity, where the instrument as it stands is without meaning, words may be supplied;

(7) When a contract is partly printed and partly written, the latter part is entitled to most consideration;

(8) Estates and grants by implication are not favored;

(9) Time is not generally of the essence of a contract; but, by express stipulation or reasonable construction, it may become so.

5. O.C.G.A. § 13–2–3 provides:

**Ascertainment and enforcement of intention of parties generally.**

The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction.

by Mr. Emery, neither party introduced testimony from Mr. Emery or a representative from American Steel as to the intention of the parties regarding the meaning of the ambiguous terms in the letter agreement, it does not follow that I am bound to construe the agreement against the party drafting the document. *See e.g., C.A. May Marine Supply Co. v. Brunswick Corp.,* 557 F.2d 1163 (5th Cir.1977) (Contractual term subject to multiple interpretations should be construed against the drafter.) In ascertaining the intention of the parties the whole agreement must be considered and the substantial purpose of the agreement which must be supposed to have influence the mind of the parties must be considered. *Friedman v. Friedman,* 259 Ga. 530, 384 S.E.2d 641 (1989). In arriving at the substantial purpose of the agreement, the court must consider the surrounding circumstances at the time of the making of the contract. *Griffin v. Burdine,* 89 Ga.App. 391, 79 S.E.2d 562 (1953). The court should place itself as nearly as possible in the situation of the parties in seeking the true meaning and correct application of the language of the contract. *Aetna Life Ins. Co. v. Padgett,* 49 Ga.App. 666, 176 S.E. 702 (1934). In doing so however the court must not substitute its own legal meaning of an ambiguous term. *Georgia R.R. Bank & Trust Co. v. FDIC,* 758 F.2d 1548 (11th Cir.1985).

In this case there is sufficient evidence of the circumstances at the time of entry of the lease agreement to support the Trustee's interpretation of the letter agreement as the intent of the parties. American Steel was in need of an infusion of capital and sought out Mr. Emery as a potential investor. Mr. Emery, for income tax purposes, insisted that the agreement be structured as a sale of equipment and lease back rather than a loan with security. It is not reasonable to apply

Mr. Emery's analysis to the letter agreement with the accompanying risk of substantial loss of investment because he never inventoried, inspected or saw the equipment. Neither on the date of the transaction, nor on the date of trial of this adversary proceeding, nor at any time did Mr. Emery know the location of or condition of the equipment. The Trustee's interpretation is even more compelling since the equipment was the property of American Steel prior to the sale and lease back and American Steel was the party with all relevant information as to the age, useful life, condition and even location of the equipment on the date of the transaction. These circumstances surrounding the execution of the letter agreement as an addendum to the Lease establish the intent of the parties under the letter agreement to cap Mr. Emery's rate of return at 15% per annum and to protect Mr. Emery in the event of a decrease in value of the equipment to insure the return of his investment and a return on his investment of not less than 10% per annum.

■ The Trustee also asserts that, because Mr. Emery is not in the business of manufacturing or selling equipment and has no facilities to refurbish and resell the leased equipment, he had no intent to retain a residual interest in the equipment, thereby suggesting that this transaction constitutes a lease agreement. Standing alone, this factor does not establish that the transaction constitutes a security agreement. Georgia law expressly authorizes a "Finance Lease" in which, as in this transaction, the lessor is neither a manufacturer nor seller of the equipment, but is rather a financial intermediary which purchases equipment specified by the lessee for purposes of leasing the equipment to the lessee. O.C.G.A. § 11–2A–103(1)(g) [6]. Therefore, the fact that Mr. Emery purchased equipment designated by American Steel for the sole purpose of leas-

---

6. O.C.G.A. § 11–2A–103 provides in part: ...

(g) "Finance lease" means a lease with respect to which:
(i) The lessor does not select, manufacture, or supply the goods;
(ii) The lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and
(iii) One of the following occurs:
(A) The lessee receives a copy of the contract by which the lessor acquired the goods or

the right to possession and use of the goods before signing the lease contract;
(B) The lessee's approval of the contract by which the lessor acquired the goods or the right to possession and use of the goods is a condition to effectiveness of the lease contract;
(C) The lessee, before signing the lease contract, receives an accurate and complete statement designating the promises and war-

ing back to American Steel does not alone convert the lease to a security agreement; nor does it establish a lease. Under O.C.G.A. § 11–2A–103(1)(g), " 'Finance lease' means a lease ...," and requires a determination that the transaction is in fact a lease before I can determine the transaction to be a "Finance lease."

Mr. Emery's unqualified right to require American Steel to repurchase the equipment ("sales option") during or at termination of the lease coupled with the letter agreement indicates that this purported lease is in fact a disguised security agreement. Based upon Mr. Emery's testimony at trial, it is clear that he never inspected the equipment, never inventoried the equipment, did not know of its present location or condition, had no facilities within which to store the equipment, and had no capacity to repossess, refurbish, or resell the equipment. It is clear that at all times both parties intended for American Steel to purchase the equipment prior to or upon the expiration of the two year lease term, and that the sales option was the means by which Mr. Emery could be assured some return of his investment without resorting to receiving and reselling the equipment. *See e.g., Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 689 (Bankr.S.D.Cal.1982) (In a purchase and lease-back arrangement, the lessor's option to require the lessee to repurchase the leased items at the end of the lease term, along with other indications that the lessor intended to retain no residual interest in the leased items, suggests a disguised security agreement instead of a true lease arrangement.) Additionally, the letter agreement set limits on Mr. Emery's potential loss due to depreciation, shifting the risk of ownership to American Steel. The facts of this case, viewed as a whole, therefore suggest that the lease is in fact a disguised security agreement, leaving Mr. Emery only an unperfected security interest in the equipment.

It is therefore ORDERED that Judgment under Counts I and II is entered in favor of the Trustee;

further ORDERED that, as the agreement between American Steel and Mr. Emery is a disguised security agreement, and as the Trustee has avoided that interest pursuant to 11 U.S.C. § 544, Mr. Emery holds only an unsecured claim against the American Steel bankruptcy estate;

further ORDERED that Counts III and IV are dismissed; and

further ORDERED that Count V is dismissed as moot.

---

ranties, and any disclaimers of warranties, limitations or modifications of remedies, or liquidated damages, including those of a third party, such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods; or

(D) If the lease is not a consumer lease, the lessor, before the lessee signs the lease contract, informs the lessee in writing (a) of the identity of the person supplying the goods to the lessor, unless the lessee has selected that person and directed the lessor to acquire the goods or the right to possession and use of the goods from that person, (b) that the lessee is entitled under this article to the promises and warranties, including those of any third party, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods, and (c) that the lessee may communicate with the person supplying the goods to the lessor and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies....