A91A1651. KARLAN, INC. v. KING et al.
(415 SE2d 319)

COOPER, Judge.

Appellant, a corporation operated by Mr. and Mrs. Karlan, rented office space in a building located in the Buckhead area of Atlanta. The 1982 lease executed by appellant provided that the rental would be adjusted each year based upon the increase of the Consumer Price Index ("CPI"). The 1982 lease, which was for an initial term of five years, contained an option to renew the lease term for an additional five years, stating: "Lessee shall have the option to renew this lease under the same terms and conditions for an additional 5 years, beginning June 1, 1987 and ending May 31, 1992. The base rental shall be negotiated at that time. . . ." In 1984, a partnership of which appellees are partners, purchased the building that was the subject of appellant's lease and desired to convert the property to another use. Although appellant did not initially want to relocate, appellant and appellee Kim King ("King") ultimately concluded negotiations on a Lease Termination Agreement ("Termination Agreement") in February 1985. Steven Morgan ("Morgan"), a real estate broker, who received a commission from appellees, as well as attorneys for both parties were involved in the negotiations. As a result of the Termination Agreement, appellant moved to other office space which rented for a higher base rental than appellant's former space and provided for a higher CPI adjustment. The Termination Agreement provided that the old lease would be terminated as of April 1, 1985 and that appellees' partnership would pay all of appellant's relocation costs as well as the rent differential between the old lease and the new lease for the remainder of the initial term and the renewal term under the old lease, i.e., through 1992. A letter of credit was obtained by appellant to secure appellees' obligations, and the amount of the letter of credit was based upon a schedule of total rent differentials prepared by Mrs. Karlan. The schedule based the old lease payments on the base rental in effect during the initial term of the old lease plus the anticipated CPI adjustments through the end of the renewal term of the old lease in 1992. The paragraph in the Termination Agreement that provides for the rent differential payment states: "Lessor agrees to pay to Lessee the difference between (i) the rental payments under [the new lease] and (ii) *the lease payments, including scheduled escalations,* under the [old lease] for the period beginning March 1, 1985 (or the commencement date of the New Lease) and ending May 31, 1992." Appellant moved to its new space in March 1985, and the partnership

paid the relocation costs. The rent differential was paid by the partnership over the next two years in accordance with the computations prepared by Mrs. Karlan. The Buckhead property that was the subject of the old lease was sold by appellees in June 1985. In 1987, appellant received a letter from appellees' agent which conveyed the information that the old 1982 lease would have expired in 1987; that the old 1982 lease had an option to renew at a negotiated rental; that they determined the market rental rates for the space rented under the old lease had more than doubled; that this rent increase was a scheduled increase under the old lease; that, for the purposes of computing the rent differential payments, they were increasing the rental under the old lease to the current market rates per their determination; that the rent differential payments would decrease; and that due to such decrease, an overpayment had been made and appellant owed appellees over $1,000 in overpayment. Appellant then sought to declare a default under the letter of credit; however, the real estate broker who was involved in the deal and who was charged with declaring a default under the letter of credit, refused to declare a default. Appellant then filed this suit for breach of contract, asserting that the Termination Agreement did not provide that the base rental under the old lease would be increased and the "scheduled escalations" covered only the CPI adjustments included in Mrs. Karlan's calculations. The case was tried before a jury, and after the presentation of appellant's case, the trial judge granted appellees' motion for directed verdict. Appellant appeals from that order of the court and the judgment entered pursuant thereto.

1. Appellant first contends that the trial court erred in directing a verdict for appellees. Mrs. Karlan testified at trial that the only "scheduled escalations" in the old lease were the CPI adjustments as reflected in her calculations which served as the basis for the amount of the letter of credit given by appellees. She also stated that she had discussed these figures with Morgan; that she had given Morgan copies of the calculations; that she never met with King, but all negotiations were conducted through Morgan; that Morgan never discussed with her or mentioned to her the concept of increasing the base rent under the old lease during the renewal term; that appellant would not have moved if the rent was going to be raised. Morgan testified that he did not recall himself or anyone else mentioning to anyone associated with or representing appellant the possibility of raising the base rent under the old lease; that he had discussed the issue with King who indicated that increasing the rental under the old lease would be a good way to decrease the rent differential payments; that he did not certify a default under the letter of credit because he did not believe a default had occurred due to the provision allowing the rent under the old lease to be negotiated at the time of renewal. Statements from the

attorneys involved in the negotiations over the Termination Agreement were read at trial. Appellant's attorney stated that no discussions regarding increasing the base rental occurred and that he did not consider this to be part of the agreement between the parties. Appellees' attorney stated that she could not recall if there was any discussion about a rent increase although she did not recall appellant or its attorney insisting that no increase was contemplated. King was called for cross-examination in which he testified that he took the risk of the rent in the Buckhead market increasing or decreasing; that the rent could have been adjusted up or down in 1987; that, in his opinion, the possible escalation in rent was included in the language of the Termination Agreement; that he never discussed anything with appellant's representatives; and that he did not know if his representatives had discussed this issue with appellant's representatives. It was further adduced at trial that the Buckhead building was sold by appellees in June of 1985, prior to the 1987 renewal term; that the increased rental in the Buckhead building set forth in appellees' 1987 letter to appellant was based upon a survey of buildings in the vicinity, not on an examination of the Buckhead building itself, because at the time of the survey and at the time of the rental increase the Buckhead building no longer existed. In support of their motion for directed verdict, appellees argued that appellant was represented by a lawyer during the negotiations; that appellant's representatives never inquired about or raised the issue of a rent increase; that the wording of the Termination Agreement, "the lease payments, including scheduled escalations, under the [old lease]," contemplates a negotiated rental based on current market rates at the time the old lease would have been renewed.

"There are three steps in the process of contract construction. The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (OCGA § 13-2-2); if after doing so the trial court determines that an ambiguity still remains, the jury must then resolve the ambiguity. [Cit.]" *Travelers Ins. Co. v. Blakey*, 180 Ga. App. 520 (349 SE2d 474) (1986). We presume that the trial court proceeded properly even though our record does not clearly reveal the process employed. "Ambiguity in a contract may be defined as duplicity, indistinctness, an uncertainty of meaning or expression. [Cit.]" *Travelers Indem. Co. v. A. M. Pullen & Co.*, 161 Ga. App. 784, 789 (6) (289 SE2d 792) (1982). Our review of the Termination Agreement and the evidence adduced at trial leads us to conclude that the contract is indeed ambiguous and that even after applying the applicable rules of construction, namely OCGA § 13-2-2 (1), (2), (3) and (4), the ambiguity remains. "Parol evidence is admissible to explain all ambiguities, the question as to what was intended being an issue of fact for the

jury. [Cit.]" *A. M. Pullen,* supra at 789. Even after the introduction of parol evidence, there remains a conflict in the evidence as to the intent of the parties, and this disagreement is " 'an evidentiary, factual matter for resolution by the jury and not a matter of law for determination by the court.' " *Prince v. Kujawa,* 178 Ga. App. 828, 829 (1) (344 SE2d 680) (1986). The trial court erred in granting appellees' motion for directed verdict. See *Crestlawn Mem. Park v. Scott,* 146 Ga. App. 715 (1) (247 SE2d 175) (1978).

2. Appellant next enumerates that the trial court erred in refusing to allow appellant to question Morgan on his intentions and the intentions of King in failing to specify that the Termination Agreement contemplated a possible increase in the base rental under the old lease. The questioning was an attempt by appellant to show the bad faith necessary for recovery of attorney fees under OCGA § 13-6-11. It is unnecessary to rule on this enumeration in light of our decision in Division 1.

*Judgment reversed. Birdsong, P. J., and Pope, J., concur.*

DECIDED FEBRUARY 7, 1992.

*Freisem, Swann & Malone, C. Cyrus Malone III,* for appellant.
*Jones, Day, Reavis & Pogue, David J. Bailey,* for appellees.