Clarence Edgar **MURPHY**, Plaintiff,

v.

**GEORGIA POWER COMPANY,**
et al. Defendants.

No. CV 497–182.

United States District Court,
S.D. Georgia,
Savannah Division.

May 4, 1999.

Ralph R. Lorberbaum, Zipperer & Lorberbaum, James F. Shehane, IV, Savannah, GA, for Plaintiff.

Hugh B. McNatt, McNatt, Greene & Thompson, Vidalia, GA, Cavender C. Kimble, Leigh Anne Hodge, Balch & Bingham, Birmingham, AL, R. Clay Ratterree, Tracy C. O'Connell, Ellis, Painter, Ratterree & Bart, LLP, Savannah, GA, Michael J. Burns, Richard S. Margulies, Christie, Pabarue, Mortensen & Young, Philadelphia, PA, for Defendants.

### *MEMORANDUM DECISION AND ORDER*

NANGLE, District Judge.

### BACKGROUND

Clarence Murphy brings this action to recover disability benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* In 1995, while cleaning the roof of a friend's house, Murphy fell approximately 20–25 feet to the ground and injured himself. Claiming total disability, Murphy attempted to recover $300,000 in benefits from his employer, Georgia Power Company. Murphy alleged that Georgia Power provided him with health and welfare benefits, including accidental death and dismemberment benefits provided through

the Accidental Death and Dismemberment Insurance plan for Southern Company Services, Inc. ("SCS") and Associated or Affiliated Companies, an ERISA health and welfare plan. The plan was sponsored by defendant SCS and administered by SCS and Reliance Standard Life Insurance Company (Reliance). Murphy had opted for permanent disability coverage in the amount of $300,000, and his premium and payroll deductions were based on that amount. Reliance, claiming that plaintiff was not a member of one of the classes of employees for which permanent total disability benefits were provided under the insurance contract terms, denied coverage. After administrative appeals, plaintiff filed suit to recover benefits. Georgia Power and SCS filed a cross-claim for equitable indemnity/contribution, reformation (in the alternative), and declaratory judgment and injunction for breach of fiduciary duty under ERISA. Pursuant to a Court Order, Reliance made a disability determination. Reliance's final analysis was that besides not being covered by the insurance contract, plaintiff was not permanently totally disabled. *See* Order dated Jan. 4, 1999 (Doc. 115) for full citations to the record on the above facts.

On a motion for summary judgment on the disability issue, this Court found that Reliance was a conflicted fiduciary and that the heightened arbitrary and capricious standard of review was applicable in evaluating defendant's determination of plaintiff's disability status. *Id.; Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.,* 41 F.3d 1476 (11th Cir.1995); *Brown v. Blue Cross & Blue Shield of Ala.,* 898 F.2d 1556 (11th Cir.1990). The Court further found that plaintiff's disability determination rivaled Reliance's and that under *Brown,* the burden shifted to Reliance to show that its determination was not tainted by self-interest. *Id.* at 1556–57 (stating that defendant meets its burden by justifying its determination on the ground of its benefit to the class of all participants and beneficiaries). Because Reliance had not met

this burden in its motions and supporting arguments, summary judgment was denied.

The case came before the Court for a bench trial January 15, 1999, which concluded on January 18. Prior to trial, joint stipulations of fact were filed by the parties which the Court has adopted. Consolidated Pretrial Order, Dec. 30, 1998 (Doc. 111) (hereinafter, individual stipulations from this document are designated as "Stip. ___"). The issues to be determined at trial were whether Reliance could meet its burden justifying its denial of benefits on the claim that plaintiff was not permanently totally disabled, and resolution of the contract dispute regarding whether Murphy was indeed covered under the Plan and who should bear liability. At the Court's direction, attorneys filed post-trial briefs with proposed findings of fact and conclusions of law. Having carefully reviewed these post-trial documents, together with the pleadings, the testimony of the witnesses, the exhibits before the Court and the stipulations of the parties, the Court makes the following findings of fact and conclusions of law. Fed.R.Civ.P. 52.

## I. Disability Issue

### A. Findings of Fact

1. SCS administered an Accidental Death and Dismemberment Insurance Plan (the "Plan") for SCS and Associated and Affiliated Companies, which provided accidental death and dismemberment coverage to those employees and their dependents who chose to participate, pursuant to a group voluntary AD & D policy issued by Reliance. One of the benefits made available to some of the plan participants was permanent total disability ("PTD") benefits. (Stip.2). The affiliates included, at one time or another, Southern Nuclear Operating Company, Southern Company Services, Inc., Alabama Power Company, Georgia Power Company, Mississippi Power Company, Gulf Power Company, and Savannah Electric.

2. SCS, Georgia Power, and Reliance are fiduciaries of the Plan within the meaning of 29 U.S.C. § 1104. (Stip.3).

3. Reliance first issued a policy insuring employees of SCS and its affiliates and their spouses for AD & D under the Plan effective July 1, 1989. (Stip.4).

4. Reliance was the insurer of the AD & D plan and paid benefits from the assets of Reliance. (Stip.30). The parties agree that the Plan grants Reliance discretion to make claim determinations. (Stip.69).

5. Pursuant to Georgia Power's summary plan description, "Your Guide to Benefits," Murphy elected to have permanent disability coverage in the amount of $300,000, and his premium and payroll deductions were based on that amount. On May 15, 1995, Murphy fell from a roof and injured his back, neck, and left shoulder.

6. By letter dated August 13, 1995, Murphy, through SCS, filed a claim for "accidental permanent total disability benefits" under the Policy. (Stip.35).

7. In 1995, SCS solicited requests for proposals for its AD & D plan. On May 30, 1995, Reliance, CNA Insurance Company and others were selected as finalists in the 1995 bid for AD & D coverage. Effective January, 1996, SCS obtained AD & D insurance through CNA Insurance Company. (Stips.26, 27, 28). Reliance was therefore terminated as the carrier, and was no longer in a contractual relationship with Georgia Power and SCS.

8. On August 21, 1996, Reliance's Anna Wilson spoke to Pat Murphy, plaintiff's wife, by telephone and advised that Murphy's Social Security award and medical records should be forwarded. (Stip.37).

9. At this time, Reliance conducted an investigation into whether Murphy, a union employee, was entitled to PTD benefits under the policy; eventually, Reliance determined that Murphy was a Class VII employee as listed on the policy and was not entitled to benefits and denied his claim on that basis. (Stip.38).

10. On June 18, 1997, Murphy instituted this litigation against SCS, Georgia Power, and Reliance. During the course of this litigation, by Order of this Court, the matter was remanded to Reliance for the purpose of making a benefit determination as to whether Murphy's injury caused him to have a permanent total disability. (Stip.48).

11. By letter dated December 23, 1997, Reliance advised plaintiff through his counsel that it found that plaintiff was capable of performing a sedentary occupation; thus, he was not permanently totally disabled. (Stip.53).

12. After administrative appeal by Murphy, Reliance reviewed the medical evidence and reaffirmed its denial of plaintiff's claim on April 2, 1998, finding that the medical evidence did not support permanent total disability. (Stip.64).

13. The Court found, after careful consideration of the medical information submitted by the parties, that plaintiff's benefit determination is sound and clearly sufficient to at least rival defendant's decision. Order dated Jan. 4, 1999 (Doc. 115).

14. Based on the foregoing, three conflicting areas of interest emerge for Reliance: (1) Reliance is both the insurer as well as the benefits decisionmaker; therefore, Reliance will suffer a direct financial detriment as a result of any decision to confer benefits; (2) Reliance was no longer in a contractual relationship with Georgia Power and SCS at the time it made the benefits decision and no longer has financial incentive to cooperate with Georgia Power in providing benefits for its employees; and (3) Reliance made its benefits determination only after denying the claim on other grounds and after a lawsuit and cross-claim were filed.

15. Because of inherent conflicts of interest, the Court does not credit Mr. Paul Gimmill's testimony at trial that Reliance did not consider the amount of the benefit at issue in making its benefit determination.

16. Evidence before the Court regarding how many outstanding claims remain to be settled under the 1989 Contract is inconclusive, but trial testimony indicated that there were few.

## B.  Conclusions of Law

1. This Court has jurisdiction over this action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* Venue in this district is proper. 29 U.S.C. § 1132(e)(2).

■ 2. The Court determined that because Reliance is a conflicted fiduciary, the heightened arbitrary and capricious standard of review under ERISA applies to the Court's review of Reliance's disability determination. Order dated Jan. 4, 1999 (Doc. 115); *Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir.1997); *Lee v. Blue Cross/Blue Shield of Ala.,* 10 F.3d 1547, 1552 (11th Cir.1994).

■ 3. The arbitrary and capricious standard is modified to compensate for the nature and type of conflict presented, *id.* at 1552, and a conflict of interest is weighed as a factor in determining whether there is an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 103, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). These standards apply to both the administrator's construction of plan terms as well as factual findings. *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1451 (11th Cir.1997).

■ 4. Even a wrong, but apparently reasonable interpretation is arbitrary and capricious if it advances a conflicted fiduciary's interest at the expense of the affected beneficiary "unless the fiduciary justifies the interpretation on the ground

of its benefit to the class of all participants or beneficiaries." *Brown,* 898 F.2d at 1556–57. Under the arbitrary and capricious standard, the court determines if the administrator, using the facts before him at the time the decision was made, made the decision rationally and in good faith, not whether it is right. *Lee,* 10 F.3d at 1550.

■ 5. Using *Lee*'s two-pronged analysis for determining whether a fiduciary has acted in an arbitrary or capricious manner, the Court determined by using *de novo* review that plaintiff has met the first prong by showing that his determination of benefit eligibility at least rivaled that of defendant's. Order dated Jan. 4, 1999 (Doc. 115).

6. After plaintiff met the first prong, the burden then shifted to Reliance to justify its determination on the ground of its benefit to the class of all participants and beneficiaries. *Brown,* 898 F.2d at 1556–57. A fiduciary can "purge" his determination of self-interest by demonstrating facts bearing out the fiduciary's assertion that his decision is "calculated to maximize the benefits available to plan participants and beneficiaries at a cost the plan sponsor can afford (or will pay)." *Id.* at 1568.

7. This burden is especially difficult for Reliance because it no longer is the insurance carrier. Reliance itself makes the legal conclusion that "it was impossible for RSL [Reliance] besides pointing to its objective, independent handling of the claim as documented by the administrative record to establish that it acted without any conflict and in the best interest of the plan participants."[1] Reliance's Proposed Finding of Facts at 11 (Doc. 139).

---

1. Reliance's contention that the *Brown* decision mandates an "impossible" standard in requiring the fiduciary to show that its determination benefits all plan participants when the plan has been terminated prior to the submission and review of a claim is incorrect. Reliance's Mem. Law Re Perm. Disability at 4 (Doc. 144). A conflicted fiduciary would not

necessarily lose when it no longer is the insurance provider. Under the *Brown* analysis, a fiduciary would win the disability determination decision whenever a plaintiff's determination failed to at least rival the fiduciary's. In that case, the defendant would win on the first prong because the "impossible" burden created when the fiduciary is no longer the

8. Reliance has failed to meet its burden. Reliance's claims that its medical experts were independent and that it did not consider the amount of the benefit at issue are not sufficient to purge itself of self-interest. *See Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.,* 41 F.3d 1476, 1482 (11th Cir.1995) (finding conflict exists when claims administrator rendered decision in midst of two years of litigation in which the claimant's employer was fighting to deny claim).[2]

9. Because of the foregoing, Reliance's disability determination was arbitrary and capricious because it advanced its own determination at the expense of an equally sound determination proposed by the plaintiff and has failed to purge itself of the taint of self-interest.

10. The Court therefore finds that Murphy is permanently totally disabled under the terms of the plan and under the standards adopted by the Eleventh Circuit in *Brown, supra.*

11. As to Reliance's counterargument, the Court disagrees that the *Brown* standard contravenes the Supreme Court's ruling in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Reliance argues that the *Brown* standard improperly shifts the burden of proof onto Reliance when the parties agreed beforehand that Reliance would have exclusive discretionary authority to make benefit determinations, stating that *Firestone* held that "[n]either general principles of trust law nor a concern for impartial decisionmaking [ ] forecloses parties from agreeing upon a narrower standard of review." *Id.* at 116, 109 S.Ct. 948.

While the parties agreed on the decisionmaker, Reliance points to no clauses in the Plan which constitute an agreement on the standard of review a court is to use in reviewing the determination of the decisionmaker. Furthermore, *Brown*'s burden-shifting mechanism was initiated to comply with *Firestone*'s mandate to hold insurers to their fiduciary duties under ERISA, which was enacted as remedial legislation, by weighing fiduciaries' conflicts of interest as a factor in determining whether there is an abuse of discretion when a plan gave the fiduciary the discretion to make plan interpretations. *Firestone,* 489 U.S. at 103, 108, 109 S.Ct. 948; *Brown,* 898 F.2d at 1558–1564.

12. Because the Court finds that Murphy is permanently and totally disabled under the definition of the policy, the Court will proceed to determine whether Murphy, as a Class VII insured, was covered under the terms of the contract.

## II. Contract Issues

### A. Findings of Fact

1. The Court's findings of fact, items 1–10, 14, and 16 as outlined in Part I (Disability Issue) give foundation for determining Murphy's rights under the contract. The following are additional facts which the Court deems pertinent and does hereby adopt.

2. After Reliance first issued the Plan in July of 1981, it was reissued in July of 1989 to reflect amendments to the original policy. At the time the policy was reissued, eligible persons were separated into six individual classes. Three of the classes were composed of employees, retirees, and directors, and each member and

---

insurer would not have to be addressed because plaintiff failed to meet his burden on the first prong. Hence, the burden of proof would not shift, and the former insurer would win. The standard merely holds the ERISA insurer accountable to its fiduciary role. Also, a former insurer could possibly win on the second prong of *Brown* were a number of beneficiaries continuing to make claims after coverage ceased.

**2.** Neither do Reliance's attempts to rely on the "reasonableness" of its determination meet this burden. Under the heightened burden, defendant is required to show more than mere reasonableness, it must also purge itself of self-interest. *Brown,* 898 F.2d at 1558.

employee of a law firm retained as General Counsel, while the remaining three classes were composed of spouses of the first three classes. The 1989 policy was signed by SCS and countersigned by a licensed resident agent. (Stip.5).

3. SCS's application (which is expressly made a part of the contract under the "Entire Contract" provision (page 7)) defines these classes and specifically provides under Section 5 entitled "Benefits":

Accidental Death and Dismemberment insurance with:

.    .    .    .    .

Permanent Total Disability Benefits— (Lump Sum):

Employee Only

(Classes I and III)

Under the Description of Coverage on page 4, a footnote states, "The permanent total disability benefit is available to Classes I and III only." (Stip.6).

4. At the time the 1989 Contract was drafted by Reliance, Class I was the only class containing employees. Class I included white collar employees and some union employees. Class III was a non-employee class composed of directors of the Southern Company affiliates and members and employees of law firms retained by the affiliates as general counsel. (Stip.7).

5. Several amendments were made to the policy after 1989, some of which added new eligibility classifications or changed the definitions of insureds in a particular class. (Stip.8). By the time Murphy made his claim for PTD benefits, the amended contract contained sixteen eligibility classes, of which five (Classes I, VII, IX, XI and XIII) were employee classes.

6. Prior to 1991, every rate quote requested by SCS sought to include PTD benefits. In 1991, the Southern Company created a new affiliate, Southern Nuclear Operating Company. SCS requested by letter dated February 6, 1991, that Reliance provide a rate quote to add the new

union employees to the Plan. The enclosure specified that the plan design for the union employees should be identical to the system wide AD & D plan then in effect. The plan design at that time included PTD benefits for all employees. (Stip.9).

7. The policy was amended effective January 1, 1992 to add two additional classes of insureds: Class VII was comprised of active union employees of Plant Farley under Southern Nuclear Operating Company, Inc., and Class VIII insureds were the spouses of Class VII insureds. (Stip.10).

8. Several of Reliance's internal documents indicated that the new employees could not be included in Class I because they were paying a higher premium rate than those union and non-union employees already included in Class I. A new employee class, Class VII, was created. (Stip.11).

9. Classes VII and VIII were created by Reliance. Class VII was to be composed of union employees of the Southern Nuclear Operating Companies, which included Plant Farley and later, Plant Vogtle and Plant Hatch. Class VIII consisted of the spouses of Class VII insureds. (Stip.12).

10. To add these classes to the contract, Pat Santa Maria, a junior underwriter at Reliance, completed a handwritten Reliance underwriting digest form (Reliance II 845–846, Tab 13) on January 6, 1992. Ms. Santa Maria wrote out the definition of Class VII and VIII, and at the bottom of that page under "Benefits," she checked the box indicating that Class VII is to receive AD & D with PTD benefits, and Class VIII (the spouses) were to get AD & D without PTD. (Stip.13).

11. Almost a full year passed before Reliance drafted the amendment adding Class VII to the coverage and sent it to SCS for signature, although the amendment bore an effective date of January 1, 1992. The amendment was signed on November 16, 1992 and returned to Reliance. (Stip.14).

12. Effective January 1, 1993, the policy was again amended to change the definition of Class VII and to add five new classes of eligibility (Classes IX through XIII). Pursuant to this amendment, Class VII included active union employees of Southern Nuclear Operating Company, except employees of United Plant Guard Workers of America. (Stip.15).

13. Effective January 1, 1994, Class VII was again changed to include active union employees of Southern Nuclear Power Operating Company, Inc. and Alabama Power Company, excluding employees of United Plant Guard Workers of America. That same amendment added active union employees of Georgia Power to Class VII effective February 1, 1994. (Stip.16).

14. As an International Brotherhood of Workers Union employee of Georgia Power, plaintiff Murphy is a Class VII insured under the policy's eligibility classifications. (Stip.17).

15. Due to numerous amendments and proposed changes in coverage, Reliance prepared a draft of a revised contract in 1995 ("1995 Contract"). Reliance proposed to make the 1995 Contract effective January 1, 1995. The application for the 1995 Contract was never signed by anyone at SCS. On page 3.0 of the 1995 draft, the provision entitled "Entire Contract" provides:

> The entire contract between you and us is this Policy, *your signed application for this policy (a copy of which is attached at issue )*, and any endorsements or amendments. (Emphasis by parties). (Stip.18).

16. This draft of the 1995 Contract was never signed by a licensed resident agent. (Stip.19).

17. Prior to the February 1, 1994 amendment to the contract adding Georgia Power union employees, Georgia Power union employees had accidental death and dismemberment coverage through Provident Life Insurance Company ("Provident") ("Provident Policy"). The Provident Policy did not provide or contain a permanent total disability benefit for the Georgia Power union employees as part of its Accidental Death and Dismemberment coverage. (Stip. 20 and 21).

18. Georgia Power union employees paid a premium of $.035 per one thousand dollars per month for coverage under the Provident Policy. (Stip.22).

19. Effective with the January 1989 Reliance policy, Georgia Power's non-union employees came under the Reliance policy, though the Georgia Power union employees remained under the Provident Policy until February 1, 1994. (Stip.23).

20. Prior to 1994, Sedgwick James of Georgia, Inc., (later known as Sedgwick, Noble, Lowndes) ("Sedgwick") had been retained by SCS to assist in working with Reliance to make certain changes to the policies, as reflected in the amendments identified above. (Stip.24).

21. Correspondence exists from Susan Snyder–Bass of Sedgwick to Reliance and SCS in late 1993, at which time there were discussions among Reliance, Sedgwick, and SCS regarding amendments to the policy. (Stip.25).

22. In 1995, SCS, through Sedgwick, decided to solicit requests for proposals for its AD & D plan. In various correspondence and documents regarding the marketing of the plan, Sedgwick stated that only certain classes of employees, not including Class VII, were eligible for PTD benefits under the Reliance policy in effect at that time. (Stip.26).

23. In letters dated May 30, 1995 to the finalists in the 1995 bid for AD & D coverage, which were chosen by SCS, which finalists included Reliance and CNA Insurance Company, Sedgwick wrote as follows:

> At present, not all employees are eligible for Permanent Total Disability. (At this point, some unions are excluded for this benefit. This primarily depends on

when they joined the program. See the Benefit Summary for this class breakdowns) [sic]—If the blended rate is to be offered, all employees must be eligible for this benefit. Can you provide this benefit to all employees? What will be the rate impact for this provision?

(Stip.27).

24. Effective January 1996, pursuant to the aforementioned 1995 bid process, SCS obtained Accidental Death and Dismemberment insurance, including PTD benefit coverage for all employees, both union and non-union, through a policy of insurance issued by CNA Insurance Company. (Stip.28).

25. The Court notes from the above facts that from 1981, when Reliance was first enlisted as an insurer, to 1995, when CNA assumed responsibility for coverage for SCS, the course of dealings between SCS, Reliance and the affiliated companies reflected growing complexity and even confusion as numerous classes and amendments were added to the contracts. Multiple parties were involved in contract negotiations, and employees who were sending memos and engaging in negotiations at times acknowledged the presence of PTD benefits for union employees and at other times noted the absence of such benefits.

26. The course of dealing between SCS and Reliance indicates a priority on the part of SCS to include union employees for PTD coverage. The existence of this coverage was not always made amply clear in the amendments to the insurance contract.

a. Prior to 1991, several rate quotes were requested by SCS at various times to add union employees of the affiliates to the Plan and were provided by Reliance. According to Reliance's documents, in 1986, Mississippi Power union employees were added to the "current Southern Company voluntary AD & D program" with the same plan design, which included PTD benefits. These union employees were added to existing Class I by amendment to the policy. Reliance Ex. AC, SCS at 132–134. A letter written by Ron Holmes, Reliance's salesman responsible for the SCS account, offered to extend this coverage (SCS Ex. AF), by offering the Mississippi Power union employees the "current Southern Company benefits" at the "current rates." Holmes testified that the term "current Southern Company Benefits" included PTD. Holmes Dep. at 29–32. No mention is made of PTD in the amendment adding these employees; however, Reliance admitted that Mississippi Power union employees received PTD benefits.

b. In 1986, SCS requested that Reliance provide a rate quote for adding its large affiliate unions to the AD & D plan. Reliance responded by quoting a rate for coverage under the plan at $.042 per thousand dollars of coverage per month, but excluding the PTD benefit. In response, SCS insisted that Reliance reconsider and quote the rate including PTD benefits. Reliance's head underwriter, Wayne Steigerwalt, assistant Vice President of Special Risks and the chief underwriter for Reliance, responded with a memorandum dated September 23, 1986 to Ron Holmes, where he acknowledged that "*since the PTD appears to be of major concern*, we will offer the *existing* Southern Company plan to the Unions (with PTD) for $.045 per thousand [dollars of coverage] per month." SCS Ex. AE. (Emphasis added). After receiving a quote of $.045 for full benefits including PTD for large unions (SCS Ex. AF), SCS opted to not add the large unions to the plan.

c. However, two years later in 1988, SCS sought to add all union employees of affiliate Savannah Electric to the policy. In his July 12, 1988 letter confirming Reliance's offer to add these union employees (SCS Ex. AH), Holmes stated, "Reliance Standard Life is willing to offer the *current benefits* to the employees of Savannah Electric at the current Southern Company rates." (Emphasis added). Holmes Dep. at 43–44. In that letter, Holmes stated Reliance's position that any future groups of union employees would be added at

rates normally charged for the type of risk. The letter does not give any notice that future union employees would not be provided PTD benefits-it merely indicates that their premium rate would be higher. Greg Marshall, Supervisor of Group Insurance and Health Care Manager at SCS, testified that Holmes told him a new blue collar rate would have to be quoted for any unions in the future. Savannah Electric union employees were added to Class I.

d. On September 23, 1986, Mr. Steigerwalt calculated premiums for union employees at $.039 without PTD and $.042 with PTD in a memorandum responding to SCS's request for a quote to add the larger unions to the Plan with PTD. SCS Ex. AE. In an internal memorandum to Holmes, Steigerwalt stated, "I have provided both rates as I fear Southern Company will want to keep coverages on the union employees very similar to the plan which is currently in force." SCS Ex. AI.

Holmes admitted that SCS had told him in connection with previous requests for rate quotes, it wanted PTD for the unions, and that Steigerwalt's additional rate quote without PTD was not requested by SCS. Holmes Dep. at 48–49. Greg Marshall of SCS testified that for labor relations purposes, it was very important to SCS that its unions have the same benefits as other employees in the plan, especially other union employees.

e. In 1991, SCS created a new affiliate, Southern Nuclear Operating Company ("SNOC"), to combine the nuclear operations of its affiliates, Alabama Power Company and Georgia Power Company. The white collar employees of SNOC were added to the AD & D plan. The amendment adding these white collar employees said nothing about PTD coverage. SCS Ex. DP. Reliance admitted, however, that these white collar employees had PTD.

f. SCS requested by letter in 1991 that Reliance provide a rate quote to add SNOC's union employees as eligible employees to the Plan. The enclosure to the letter specified that the plan design for the union employees should be identical to the system wide AD & D plan then in effect. *Id.* In his cover memorandum to Steigerwalt, Holmes repeated the request that the plan design be the same. SCS Ex. AL. Steigerwalt and Holmes both testified that all employees in the plan at this time (which included some union employees) had PTD benefits. Thus, the plan design at that time included PTD benefits for all employees, both union and non-union.

27. Negotiations leading up to the creation of Class VII indicate a clear intent of the parties to continue to include PTD benefits for all employees, both union and non-union.

a. Steigerwalt calculated a rate of $.035 per thousand dollars of coverage per month in 1991 in response to SCS's request for a rate to add new union employees to the Plan. SCS Ex. AP. (Over the years, AD & D premium rates had generally been decreasing. Holmes Dep. at 44; trial testimony of Steigerwalt and Ralph Sayre). An internal memo from Steigerwalt to Holmes gave no indication that PTD benefits were being excluded, but noted that union employees may "participate in the Southern Company Voluntary Plan . . . ." SCS Ex. AP.

b. Holmes testified that he recalled no discussions with Steigerwalt about PTD being excluded for the unions. Holmes Dep. at 71. After receiving the above memo, Holmes wrote Marshall a letter dated March 22, 1991 (SCS Ex. AN), which stated, "As we discussed over the telephone, we are willing to offer the *current program* to the approximately 1,100 union employees of the Hatch, Vogtle, and Farley plants" at the .035 rate. (Emphasis added). *At the time of this letter, the "current program" included PTD coverage for all employees.* Holmes Dep. at 69; trial testimony of Steigerwalt.

c. Marshall originally proposed that the new classes be added to Class I (containing all other employees on the Plan) (SCS Ex. AR), but this was rejected by

Steigerwalt. SCS Ex. EB. Reliance's internal documents (SCS Ex. AO and AQ) and Steigerwalt's trial testimony indicated that the new union employees could not be included in Class I because they were paying a higher premium rate than those union and non-union employees already included in Class I. No other reason is documented for the creation of Class VII other than the higher premium rate. Notably, no documentation exists that PTD benefits were to be excluded from this group; internal documentation only speaks to getting the proper rate for these unions. Trial testimony of Steigerwalt; SCS Ex. BE, AO, AQ, BU, DB, and CG.

d. The paper digest that was prepared in 1992 with the box checked for PTD benefits for Class VII was filled out on the instruction of Holmes, and approved by both Steigerwalt and Pat Santa Maria in the underwriting department of Reliance. Holmes Dep. at 77; SCS Ex. AQ; Santa Maria Dep. at 54–55.

e. Steigerwalt testified at trial that the handwritten paper digests are the most reliable versions documenting the amendment process because the later typed versions are subject to transcription errors. (See Finding of Fact 10 of I. Disability Issue, noting that when Ms. Santa Maria wrote out the definition of Class VII and VIII in the digest, at the bottom of that page under "Benefits," she checked the box indicating that Class VII is to receive AD & D with PTD benefits, and Class VIII (the spouses) were to get AD & D without PTD). (Stip.13).

f. The digest approved by Ms. Santa Maria was sent to the contracts department at Reliance to be converted into a policy amendment. Sheila Bianco, the Reliance senior contract analyst in charge of drafting the amendment, explained in pages 12–16 of her deposition that, when she prepared the amendment, she included the definitions of Class VII and VIII from the paper digest; however, she made no other changes to the contract regarding

PTD. She explained that she was aware at that time that all unions on the plan had PTD benefits, so she did not think any additional changes were necessary for the new Class VII to have PTD benefits. For this reason, no changes were made to the footnote on page four of the policy or the "Benefits" section of the application, to make clear that Class VII was to have PTD benefits.

g. The fact that the amendment adding Class VII (SCS Ex. AB at Reliance 3211–3212) says nothing about PTD benefits is not dispositive. Prior amendments adding union employees of Mississippi Power Company and SNOC employees also made no reference to PTD benefits, yet Reliance acknowledged that those employees had PTD.

28. Typically, long delays occurred in the parties' transactions, which further complicated the contract formation process. Although the digest was approved on January 6, 1992, and the amendment bore an effective date of January 1, 1992, almost a full year passed before Reliance drafted the amendment adding Class VII to the coverage and sent it to SCS for signature. The amendment was signed on November 16, 1992. Marshall of SCS testified that because of these "routine" delays, SCS frequently would have to rely on Reliance's word as to what the amendments would entail.

29. Reliance failed to clearly state its intentions regarding the provision of PTD benefits for workers that were added to Class VII, evidencing the tension between the two differing philosophies of SCS and Reliance: SCS wanted to provide similar coverage for all of its union employees, including PTD; Reliance believed such a policy would drive rates up because blue collar workers tend to get hurt more often. Holmes Dep. at 34. The SNOC union employees of Plant Farley were the only employees approved by Steigerwalt in 1991. SCS Ex. AM and AN. In November 1992, SCS sought to add Plant Vogtle and

Plant Hatch, which were added to Class VII by amendment (all union employees of SNOC were included at this time). SCS Ex. AB at Reliance 4354–55. Despite Reliance's previous approval for these employees to be added under the "current program" in 1991, and the digest indication that Class VII would have PTD benefits, Steigerwalt testified that he did not intend to give the employees of these two unions PTD benefits. SCS Ex. AM, AN, and AP. Steigerwalt further testified that he did not disclose his intent to withhold this benefit and did not feel the need to disclose his intent, despite SCS's declaration of the importance of having the same coverage, including PTD, for all of its unions.

At the time Georgia Power union employees were added to Class VII in 1994, Reliance did not give explicit notice to SCS or its broker that it did not intend to provide PTD benefits to Class VII insureds.

Based on this lack of notice and on SCS and Georgia Power's reasonable belief that PTD benefits were a part of the Plan, SCS and Georgia Power prepared and distributed a summary plan description of all the benefits available to Georgia Power employees, including the PTD benefit. Their reasonable belief was founded on the entire course of dealing with Reliance and the representation made by Reliance that members of Class VII would be eligible for the "current program," which at the time of the statement included PTD benefits for all employees. At the times relevant to plaintiff's claim, the summary plan description indicated that all employees (regardless of their union affiliation) were eligible to participate in the AD & D plan with PTD benefits.

29. The Court credits the testimony of actuarial expert Ralph J. Sayre, who found that the rate quote for Class VII union insureds of $.035 actually included a premium load for PTD benefits, indicating a further intent of the parties that PTD benefits be offered to that class. Sayre reached his conclusion by showing two different ways the $.035 rate included the premium load for PTD.

a. First, the $.035 rate falls exactly on the trend line with Reliance's previous rate quotes in 1986, 1988, and 1989 that included PTD. At this time, AD & D rates had been and were continuing to fall dramatically.[3] Had the $.035 rate not included PTD, the 1991 quote would have constituted a rate increase in relation to the 1989 quote, not a decrease. AD & D rates at this time were decreasing, not increasing. Accordingly, the $.035 rate logically included the PTD benefit.

b. Second, the $.035 rate was derived by Mr. Steigerwalt by using the existing white collar (non-union) rate of $.025 as a base, which he then marked up as recounted above. Steigerwalt testified that he has no records of his rate calculation, but stated that he arrived at the $.035 rate by taking the $.025 rate for white collar employees and marking it up 40%. This white collar rate already included a white collar PTD load.[4] Steigerwalt additionally

---

3. Because of the dropping rates, the stipulated fact regarding the $.035 rate for coverage under the Provident Policy (Finding of Fact 18, p. 14), which did not have PTD for Georgia Power's union employees, provides no basis for assuming this later rate did not include PTD.

4. An analysis of the 40% markup indicates whether a premium load for PTD was included. 32% of the 40% markup was the blue collar load for AD & D alone. (Steigerwalt testified that in 1991, to calculate the AD & D with PTD for union members, he would start with an AD & D only rate and then add a blue collar AD & D load—which he testified was 32% for the SCS unions—to come up with a blue collar AD & D rate. He then would add a load for PTD in the range of 5–10% (5% for white collar up to 10% for blue collar)). The white collar rate already had a 5% load for white collar PTD in it; therefore, it was only necessary to add 5% more to total the 10% blue collar load for PTD. The 32% for AD & D plus 5% more for PTD totals a 37% markup. Because Steigerwalt marked up the white collar rate 40%, he achieved the full 10% PTD load plus 3% extra. Therefore, the $.035 rate easily included a load for PTD.

testified that he could neither confirm nor deny that his rate included a load for PTD benefits.

30. The terms of the 1989 Contract are unreliable with respect to identifying which classes had PTD benefits under the plan. At the time of Murphy's claim, five employee classes existed under the policy, Classes I, VII, IX, XI, and XIII. Classes III and XV were non-employee classes who also were supposed to have benefits. As noted previously, the contract stated under Section 5 entitled "Benefits":

> Accidental Death and Dismemberment insurance with:
>
> .     .     .     .     .
>
> Permanent Total Disability Benefits— (Lump Sum):
> Employee Only
> (Classes I and III)

Under the Description of Coverage on page 4, a footnote states, "The permanent total disability benefit is available to Classes I and III only." (Stip.6). Yet Steigerwalt admitted at trial that Classes IX, XIII, and XV had PTD benefits, even though the page four footnote did not list those classes as having that benefit. None of the amendments that added these classes say anything about PTD being included or excluded. SCS Ex. AB, Reliance 4354–55; ED, EE. Steigerwalt stated at trial that it was an "oversight" that amendments adding these classes said nothing about PTD. Yet, he contended that this same omission with regard to Class VII was not an oversight. Considering all the facts and circumstances, Steigerwalt's explanation is implausible. The Court concludes that the omission of PTD benefits for Class VII, like Classes IX, XIII, and XV, was an oversight as well.

31. The Court gives little weight to testimony by employees or agents of Reliance, SCS, and Georgia Power who were not involved in the contemporaneous contract negotiations and execution of the 1989 Contract because their testimony is irrelevant as to intent. Thus, claims by Reliance that SCS and Georgia Power had "notice" that PTD benefits were not included in the 1989 Contract are not substantiated by comments made by employees of Sedgwick (SCS's broker), Jo Molock (who gave testimony regarding a Corporate Concerns letter), and others, who were making indirect references to documents years after the fact, and who were sometimes not even directly analyzing the issue of PTD.

32. Because of the numerous amendments since 1989 and because of proposed changes in coverage, Reliance prepared a revised draft in 1995 (the "1995 Contract"). Although Reliance proposed to make the 1995 Contract effective January 1, 1995, the draft was never signed by a licensed resident agent, and the application was never signed by SCS. On page 3 of the draft, the provision entitled "Entire Contract" provides:

> The entire contract between you and us is this Policy, *your signed application for this policy (a copy of which is attached at issue)*, and any endorsements or amendments. (Emphasis added).

Reliance's Holmes and Sedgwick's Susan Snyder–Bass also testified that the 1995 Contract was never in effect. Holmes Dep. at 127–28; Bass Dep. at 65.

## B. Conclusions of Law

1. Jurisdiction and venue in this Court are proper as outlined in Section I.

2. As in the analysis of the disability issue, the parties agree the arbitrary and capricious standard of review under ERISA, 29 U.S.C. §§ 1002, *et seq.*, applies to this Court's review of Reliance's determination that Class VII employees did not have the PTD benefit because the Plan gives Reliance the discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. Similarly, because the Court has determined that Reliance is a conflicted fiduciary, the Court will again employ a heightened arbitrary and capricious standard pursuant to

*Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir. 1990).

■ Application of this standard requires the Court to look to the facts known to the administrator at the time the decision was made to deny Murphy's coverage. *Lee*, 10 F.3d at 1550. From this information, the Court then uses a *de novo* standard to determine whether SCS/Georgia Power's interpretation of the Plan is sound and whether it rivals Reliance's interpretation.[5] If the Court finds that the SCS/Georgia Power interpretation rivals Reliance's, then the Court evaluates whether Reliance's interpretation was arbitrary and capricious.

■ 3. The Court agrees with SCS and Georgia Power that the 1989 Contract is to be construed for the purposes of determining Murphy's coverage. Because any modification or amendment to an existing ERISA plan may not be adopted or applied unless the amendment or modifications are adopted in a formal, complete, and written form, the Court finds that the revised 1995 Contract was never formally adopted because it was not signed. Employee Retirement Income Security Act of 1974, § 402(a)(1), 29 U.S.C.A. § 1102(a)(1); *Smith v. National Credit Union Admin. Bd.*, 36 F.3d 1077, 1081 (11th Cir.1994).

Additionally, the contract itself provided that a signed application was necessary, indicating the 1995 draft was merely a proposal. Therefore, the Court will construe the terms of the 1989 Contract for purposes of resolving this controversy.

■ 4. The Court agrees with SCS and Georgia Power that the 1989 Contract with its numerous amendments is ambiguous. The interpretation of an insurance contract, including the determination and resolution of ambiguities, is a question of law for the court to decide. *Dahl–Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993) (citing *Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir.1985)). In determining whether an ambiguity exists, courts must look at the entirety of an insurance contract and interpret its terms. *Id.* at 1381–82. Ambiguity exists if a term is susceptible to two or more reasonable interpretations that can be fairly made. *Id.* at 1381.

a. The Court concludes that the language in the contract governing which classes have PTD benefits is ambiguous on its face. The contract plainly provides that the PTD benefit is designated "Employee Only" (Classes I and III) when Class III was a non-employee class. The

---

5. Murphy has adopted the SCS/Georgia Power interpretation of the Plan. Regardless of Murphy's position, however, he would be entitled to benefits because the Court has found that he was disabled under the Plan. Murphy relied on the summary plan description by Georgia Power which stated that he had the option of adding PTD benefits to the AD & D plan being provided. Murphy opted for $300,000 coverage for PTD, and his paychecks were deducted accordingly. 29 U.S.C. § 1024(b)(1) provides that a company must provide the insured a summary plan description. The statute requires that the summary plan document be "sufficiently accurate and comprehensive to reasonably apprize" the plan participants of their rights under the plan. 29 U.S.C. § 1022(a)(1). The requirement entitles the participant to rely on the summary plan document, and if he does, the plan is estopped to deny coverage. *Senkier v. Hartford Life & Accident Insurance Co.*, 948

F.2d 1050, 1051 (7th Cir.1991). This statute protects the insured because in the event of a discrepancy between the coverage promised in the summary plan document and that actually provided in the policy, he is entitled to claim the former. When the summary plan description erroneously misstates the contract and the insured does not have a copy of the plan, then the plan administrator will be held liable. *Edwards v. State Farm Mutual Automobile Insurance Co.*, 851 F.2d 134 (6th Cir. 1988). Similarly, when an employer negligently issues a plan description claiming coverage that is not actually in the company's insurance contract, then the employee is still entitled to benefits, but it is the employer, not the insurer who is liable. *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226 (3rd Cir.1994). The threshold question in this inquiry then becomes whether the insurance policy actually covered members of Class VII.

term "Employee Only" irreconcilably conflicts with "Classes I and III." The terms are capable of more than one interpretation because they could be construed to mean only employees, or only employees of Class I and III.

b. Not only is facial ambiguity apparent, but testimony also revealed latent ambiguity. Even though the footnote on page 4 stated that PTD was available to "Classes I and III only," Reliance admitted that Classes IX, XI, XIII, and XV had PTD benefits. Thus, Reliance's argument that any discrepancy in the contract is immaterial because it did not involve Class VII is unavailing, because by its own testimony, it admits that the contract is inaccurate in delineating which classes had PTD benefits. Thus, the facial ambiguity noted above is indicative of an even greater latent ambiguity that was made apparent through testimony.

5. Having ruled that the contract is ambiguous as a matter of law, the Court applies the doctrine of *contra proferentem* (construing terms against the drafter) to determine that Reliance's interpretation of the contract is wrong. *See Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1551 (11th Cir.1994) (finding application of *contra proferentem* appropriate in resolving ambiguities in insurance contracts regulated by ERISA and also citing a string of cases showing that other circuits also have widely adopted this holding).

6. While the doctrine of *contra proferentem* suffices to resolve the ambiguity, the Court further finds that extrinsic evidence overwhelmingly supports the finding that the intent of the parties was that Class VII was to have PTD benefits. *See First Capital Life Ins. Co.–In Conservation v. AAA Communications, Inc.*, 906 F.Supp. 1546 (N.D.Ga.1995) construing Georgia law to determine the in-

tent of the parties in an ERISA case involving an ambiguous contract (citing *Richard Haney Ford, Inc. v. Ford Dealer Computer Serv.*, 218 Ga.App. 315, 461 S.E.2d 282 (1995) (applying Georgia rules of construction under O.C.G.A. § 13–2–2)); *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995) (holding that a court may look to state law for guidance "so long as the state law is not contrary to the provisions of ERISA."). Additionally, parol or extrinsic evidence is admissible to resolve contractual ambiguities. *First Capital*, 906 F.Supp. at 1552 (citing *Karlan, Inc. v. King*, 202 Ga.App. 713, 415 S.E.2d 319 (1992)). The Court concludes that the following evidence demonstrates the parties' intent was for Class VII to have PTD coverage: [6]

a. Providing PTD benefits for all employees was an obvious priority of SCS and was even acknowledged by Reliance. Also, it is logical that SCS would aim for providing the same kind of benefits to all union employees to avoid discord among the affiliates.

b. The internal documents reveal that the only reason for the creation of Class VII was because the newly added employees were going to be charged a higher rate.

c. Reliance failed at any time to give notice that PTD benefits were not going to be provided to Class VII, even though Reliance stated that the newly added class would get the "current program," and the "current program" at that time provided the PTD option for all employees. In fact, Steigerwalt stated that he did not disclose his intent to withhold the PTD benefit and did not feel the need to disclose his intent, an omission which this Court finds unconscionable in light of the many inquiries SCS had made about providing these benefits to its union employees.[7]

---

**6.** Even if the Court had found no ambiguity in the contract, the following, especially Santa Maria and Bianco's testimony provides strong evidence for mutual mistake of the parties, which would provide SCS and Georgia Power

grounds for supporting their cross-claims for equitable relief.

**7.** Steigerwalt's failure to give notice on this important point provides a basis for SCS and

d. The digest prepared and approved by Reliance's own employees shows that PTD benefits were to be provided. Bianco's testimony regarding the drafting of the ultimate contract from Santa Maria's digest (denoting PTD for Class VII) indicates that she thought no changes were necessary in the contract regarding PTD for Class VII because union employees were already getting PTD.

e. The premium rate included a load for PTD benefits.

f. While Reliance attempts to persuade the Court in its brief that the extrinsic evidence supports the finding that SCS and Georgia Power knew that Class VII did not have PTD, this evidence merely proves that the contract itself was ambiguous. Reliance would have the Court ignore evidence showing that some of Reliance's employees thought Class VII had PTD benefits, while at the same time trumpeting evidence that some of SCS and Georgia Power employees thought the Plan lacked PTD benefits for Class VII. The Court acknowledges that over the years because of the multiple parties negotiating, the addition of multiple amendments, and the lengthy time of negotiations before formal adoption, SCS and Reliance employees exhibited confusion and conflicting opinions over what benefits were provided under the contract. Nevertheless, the contemporary evidence existing at the time the contract was drafted and individual amendments were added, overwhelmingly indicates that the intent of the parties was to provide PTD benefits to Class VII.

7. Because of the foregoing, the Court finds that Class VII had PTD benefits under the terms of the 1989 Contract and its subsequent amendments.

8. The Court thus agrees with the SCS and Georgia Power interpretation of the plan, finding that it is clearly superior to Reliance's wrong interpretation. "If a fiduciary's interpretation is wrong, the Court then evaluates the self-interest of the fiduciary." *Brown*, 898 F.2d at 1567 n. 12. "If a plan participant demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of the plan was not tainted by self-interest." *Id.* at 1566. "[A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Brown*, 898 F.2d at 1566–67, *Lee*, 10 F.3d at 1550.

9. Because of the conflicts of interest the Court noted in Part I (Findings of Fact and Law in Disability Issue) and Reliance's failure to meet the burden-shifting requirements, the Court finds that Reliance's wrong interpretation of the plan is arbitrary and capricious because of its failure to purge itself of self-interest.

10. The Court, having found a legal remedy for the parties, will not consider the equitable remedies proposed in SCS and Georgia Power's cross-claims.

### III. Conclusion

The Court finds that plaintiff Clarence Murphy is permanently totally disabled under the terms of the 1989 Contract and subsequent amendments. The Court further finds that the 1989 Contract and its subsequent amendments are ambiguous as a matter of law, that the intent of the parties was to provide permanent total disability insurance to Class VII insureds, and that Murphy, as a Class VII insured, is entitled to permanent total disability benefits under the terms of the Contract in the amount of $300,000, the amount of

Georgia Power's cross-claims based on misrepresentation. *See* SCS/Ga. Power Am. Re- stated Cross–Cl. at 4 (Doc. 51).

coverage he elected as an employee of Georgia Power. Accordingly,

**IT IS HEREBY ORDERED** that Clarence Murphy receive $300,000.00 in permanent total disability benefits from the insurer, Reliance Standard Life Insurance Company;

**IT IS FURTHER ORDERED** that Southern Company Services and Georgia Power Company's cross-claims for equitable remedies are denied; all other motions remaining before the Court are denied as moot;

**IT IS FURTHER ORDERED** that upon a submission of bill of costs by Murphy and appropriate briefing by the parties, the Court will consider an award of attorney fees and pre-judgment interest to plaintiff Murphy pursuant to Local Rules and ERISA guidelines.