### A00A2419. LUCK v. REGIONS BANK et al.
#### (546 SE2d 342)

ELLINGTON, Judge.

Jesse Von Luck appeals the trial court's orders entering judgment notwithstanding a mistrial in favor of Regions Bank and Virginia A. Skinner in this dispute arising out of a real estate transaction. Luck sued Skinner for breach of contract and both Skinner and Regions for converting $23,000 Luck alleged should have been disbursed to him upon closing the sale of his chicken farm to Skinner. After declaring a mistrial because the jury could not reach a verdict, the trial court granted Regions' and Skinner's motions for judgment notwithstanding the mistrial. Because conflicting evidence remains for jury resolution, we must reverse.

> A motion for a judgment notwithstanding a mistrial is analogous to a motion for a directed verdict or motion for judgment notwithstanding the verdict in that the same can be sustained only where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom[,] shall demand a particular verdict. OCGA § 9-11-50 (a).

(Citations and punctuation omitted.) *Rubio v. Davis*, 231 Ga. App. 425-426 (500 SE2d 367) (1998). On appeal from a grant of a motion for judgment notwithstanding a mistrial, we view the evidence and the inferences reasonably supported by the evidence in favor of the nonmovant. See *Famiglietti v. Brevard Med. Investors*, 197 Ga. App. 164 (1) (397 SE2d 720) (1990); *Findley v. McDaniel*, 158 Ga. App. 445, 446-447 (1) (280 SE2d 858) (1981).

Viewed in this light, the record reveals that 64-year-old Luck had to sell his chicken farm to avoid foreclosure. Luck, after being in the business since he was 14 years old, lost his contract with his chicken supplier because he could not make the required repairs or upgrades to his facility. Luck, who had a fifth grade education and

was illiterate, asked his friend, real estate agent Francis Wilkes, to list the property for him. After Wilkes' listing expired, another agent, Hardy Edwards, approached Luck through Wilkes with an offer on the property from Skinner. Skinner, who lived in Connecticut, had contacted Edwards and asked him to show her some farm properties in Georgia. In late August 1992, Luck agreed to sell his farm to Skinner for $350,000, even though the purchase price was less than the $392,500 he paid for it. Wilkes and Edwards drafted the real estate contract that Luck signed. Edwards drafted the contract's special stipulations. Both Wilkes and Edwards explained the contract to Luck since he could not read. Edwards then directed Skinner to Regions, which was, at that time, the First National Bank of Jackson County, where she sought financing.

Although Regions wanted Skinner to put down 20 percent of the purchase price, it agreed to make her a 90 percent loan. Regions' settlement statement reflects that it loaned Skinner $316,800 — 90 percent of the $352,000 sale price, which was adjusted to account for earnest money and moving expenses. To obtain this financing from Regions, Skinner had to make the chicken farm operational so that she could get a letter of commitment from Harrison Company, the same chicken supplier Luck had used. Consequently, the real estate sales contract contained two provisions pertinent to those repairs. First, Exhibit C to the real estate sales contract provided:

> All parties hereto acknowledge that this sale is subject to and contingent upon . . . [the purchaser having] negotiated a contract acceptable to them and [having] received a letter of commitment from a poultry integrator of their choosing. *Any repairs to the existing poultry house and/or equipment contained therein, in order to obtain said letter of commitment[,] shall be born [sic] solely by purchasers.* In as much as the price and terms of this agreement are agreed upon with the improvements and equipment to be delivered to purchasers in the same condition at closing as they are on the date of execution of this agreement.

The contract also contained this special stipulation: "Purchasers to place $23,000.00 of sales proceeds on deposit with lender at the time of closing, said sum to be disbursed to Purchaser upon completion of improvements and repairs to subject property in a like sum following closing."

Luck, his companion Joanne Moss, and Wilkes testified that the contract, as they understood it, did not obligate Luck to pay for repairs to the property. Although Luck initialed the $23,000 repair amount on the special stipulation, he testified that he did that at

Edwards' insistence only because a dollar amount for repairs was required to be in the contract. Even Edwards, who drafted the special stipulation, testified that Luck was not required to put money into escrow, that the $23,000 was like a "line of credit," and that he told Luck the money was not coming from him but from the loan proceeds. Wilkes testified that the term "sales proceeds" in the special stipulation was intended to mean the buyer's loan proceeds. Skinner testified that the $23,000 "was part of the money that I borrowed from the bank as my loan that I'd been paying eight percent on [since] the day that I bought [the farm]." Even Jackie Whitfield, who worked for Regions and disbursed the checks at closing, testified that the $23,000 for repairs was built into the $316,800 loan amount to Skinner. Finally, Regions' closing attorney testified that he had to call the bank to verify the interpretation of the contract's special stipulation so that he would know how to allocate the $23,000 on the settlement statement.

Because the bank lost its file on Luck's real estate sale and on the disbursements made to Skinner, no records were introduced tracing the $23,000 in repair funds to or from any specific account. However, Regions' settlement statement reveals that $23,000 was taken from Luck at closing, and Whitfield acknowledged that Regions received the funds and held them for Skinner as a "construction loan." Finally, Whitfield testified that the "bank got into the negotiations with Mr. Luck through his agents" to make the sale and the loan work. He explained that "[e]verybody in the whole deal had to give."

Both Luck and Moss, however, testified that Luck did not expect to give up $23,000. In fact, they testified Luck expected to walk away from closing with about $40,000. Because Luck and Moss worked all day to clean out the farmhouse for Skinner to occupy that day, they arrived late to the closing. When they arrived, the closing attorney had already left. Whitfield described the closing as "very quiet," and agreed everyone was "restless" and "anxious" to be done with it. Whitfield handed the closing documents to Luck to sign without explanation. Neither Wilkes, Edwards, nor Luck saw the settlement papers before closing. After signing all the documents, Luck was handed his check for $18,625.80. He was surprised by the amount, but voiced no objection because he believed it was too late to do so. Wilkes, however, testified that she complained to Whitfield, who said something to the effect of "take it or leave it." Luck testified that he believed, at that point, his only alternative was to take the money or lose everything in foreclosure. Luck cashed the check immediately to pay for a place to stay. Although it was after hours, Whitfield had instructed a teller to remain open so that Luck could cash his check.

1. Luck averred that Regions converted $23,000 of his sales pro-

ceeds. As our Supreme Court fully explained:

> Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation. . . . [I]n order to be chargeable with conversion, technically it is not necessary that the defendant assert any right of ownership over the property; it is sufficient if the defendant wrongfully assumes dominion over the property inconsistent with the owner's right. . . . It is immaterial that such dominion was exercised in good faith, for [w]hoever meddles with another's property, whether as principal or agent, does so at his peril, and it makes no difference that in doing so he acts in good faith.

(Citations and punctuation omitted.) *Maryland Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 261 (356 SE2d 877) (1987).

Based on the evidence recounted above, a jury could reasonably infer that Regions exercised dominion over $23,000 that should have been distributed to Luck. In fact, a jury could infer that Regions took the $23,000 and then loaned it to Skinner, thereby directly benefitting from that use of those funds. Regions argues, however, that it was only doing what the unambiguous language of the contract required. The repairs provisions of this contract, however, are not unambiguous.

Exhibit C of the contract provided that "any repairs . . . shall be born [sic] solely by the purchasers." A jury could infer that this phrase implicitly charged Skinner with the cost of repairs. Further, one could infer from the use of the word "borne" an obligation to pay. "Borne," the past participle of the verb "to bear," can be used to mean "to accept or have as an obligation: *to bear the cost.*" Random House Webster's College Dictionary (1995), p. 120. Regions argues that any ambiguity in this provision is resolved by the more specific special stipulation regarding the $23,000 in repair costs. We do not agree.

The stipulation provides that the "Purchasers" were to place "$23,000.00 of the sales proceeds" on deposit with Regions at the time of closing and that it would be disbursed back to them upon completion of the necessary repairs and improvements to the chicken farm. "Sales proceeds" was not defined in the contract. Ordinarily, "proceeds" means "the total amount or profit derived from a sale or other transaction." Random House Webster's College Dictionary (1995), p. 1075. If the stipulation obligated the *seller* to set aside $23,000, it would make sense that Luck was setting aside a portion of his profit

to finance the repairs. Here, however, the *purchaser* was obligated to set aside the funds. Ordinarily, a purchaser is not authorized to do anything with the seller's profits. What "sales proceeds" means in this context, then, is ambiguous. Further, everyone who testified about the term "sales proceeds" agreed that it was intended to mean the buyer's "loan proceeds." Under these circumstances, the jury could infer that Luck reasonably believed the buyer intended to finance the cost of the repairs.

Despite the ambiguity in the special stipulation, Regions directed its closing attorney — who was uncertain enough about the meaning of the stipulation to call for guidance — to take the funds from Luck and distribute them to the bank. A jury could infer from the evidence that Regions did this, as Whitfield's testimony suggests, to make "the deal work." We find this evidence, viewed in favor of Luck as the nonmovant, creates a jury issue on Luck's claim for conversion. Consequently, the trial court erred in granting Regions' motion for judgment notwithstanding the mistrial. See *Kilburn v. Patrick*, 241 Ga. App. 214, 216-217 (1) (525 SE2d 108) (1999).

2. Luck also claimed Skinner breached the contract and converted $23,000 of his funds to her use. Luck argued Skinner was required to pay for the repairs either out of her own pocket or to have the cost financed. Skinner admitted she was responsible for making the repairs and that Regions reimbursed her $23,000 to cover the costs she incurred in making the farm operational. Skinner testified that, according to the contract, the $23,000 in repairs was to be financed by Regions out of the loan proceeds, funds which a jury could infer were actually taken from Luck. Because the contract language on this point is ambiguous, see Division 1, supra, and because the evidence of what the parties intended is in conflict, whether Skinner breached the contract and converted Luck's funds to her own use remains for the jury to resolve. See *Kilburn v. Patrick*, 241 Ga. App. at 216-217 (1); *Karlan, Inc. v. King*, 202 Ga. App. 713, 715-716 (1) (415 SE2d 319) (1992). Consequently, the trial court erred in granting Skinner's motion for judgment notwithstanding the mistrial.

*Judgment reversed. Andrews, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 27, 2001.

*Adkins & Whitfield, Russell L. Adkins, Jr., James R. Whitfield,* for appellant.

*John T. Brown, Ellisa Garrett,* for appellees.